George ARTHUR, et al., Plaintiffs,

v.

Ewald P. NYQUIST, et al., Defendants.

No. Civ–1972–325C.

United States District Court,
W. D. New York.

Aug. 27, 1982.

Jay, Klaif & Morrison, Buffalo, N. Y., (David G. Jay, Buffalo, N. Y., of counsel), for plaintiffs.

Aubrey McCutcheon, Sp. Counsel for the Buffalo Bd. of Educ., Buffalo, N. Y., and William E. Carey, Asst. Corp. Counsel, Buffalo, N. Y., for defendants Superintendent of Schools Eugene T. Reville and The Bd. of Educ.

Raichle, Banning, Weiss & Halpern, Buffalo, N. Y. (Frank G. Raichle, and Arnold Weiss, Buffalo, N. Y., of counsel), for defendants Mayor James D. Griffin and the Common Council of the City of Buffalo.

Jaeckle, Fleischmann & Mugel, Buffalo, N. Y. (J. Edmund deCastro, Jr., Buffalo, N. Y., of counsel), for plaintiff-intervenor Community Advisory Bd. for Bilingual Educ. of Buffalo.

Serotte, Harasym & Reich, Buffalo, N. Y. (Bruce A. Goldstein, Buffalo, N. Y., of counsel), for plaintiff-intervenor John Bushey.

Bruce Fenwick, Buffalo, N. Y., for intervenor Buffalo Teachers Federation.

Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y. (John R. Logalbo, Buffalo, N. Y., of counsel), for intervenor Buffalo Council of Sup'rs and Administrators.

CURTIN, Chief Judge.

In what threatens to become an annual ritual, the Buffalo Board of Education [the Board] is forced to ask this court to order its codefendants, the Mayor and the Common Council of the City of Buffalo [City defendants], to provide additional funds to the Board for implementation of this court's school desegregation orders.

For the 1982–83 school year, the Board requested a budget of $162,302,979. Pursuant to the budgetary process of the City charter and section 2576 of the New York State Education Law, the Mayor received this request from the Board. The Mayor and his staff reviewed the budget, held a public hearing, and recommended that the estimate be reduced to $150,000,000. After conducting additional public hearings, the Common Council added $629,822, bringing the total to $150,629,822. This is the sum currently appropriated for Board use. Approximately $149,100,000 is to be used for Board operations and maintenance, and the remainder for capital expenditures.

Under the law, the Board is financially dependent upon the City for funds. The Board has since indicated that it could operate on a minimum budget of $156,500,000. The Board cannot, however, make up the difference between the amount it needs and the amount allocated in the budget but must look to the City for adequate funding.

Because of the large gap in funds, plaintiffs filed a motion requesting that the court order the City to provide additional funds. Last year, the same dispute arose regarding funds. On July 30, 1981, the Board filed a similar petition asking for more money. Last year's dispute was settled amicably. After several meetings and much discussion, the court was able to enter an order upon consent of the parties directing the City to provide an additional $3,100,000 to the Board.

This year, there was no such agreement. The Board joined in the plaintiffs' motion, and at the court's direction, the parties conducted settlement negotiations for six days. These negotiations were ultimately unsuccessful, and the court was forced to order an evidentiary hearing. The hearing commenced on July 2, 1982, and continued for six days. Upon review of the transcript and exhibits and the post-hearing briefs, the court is ready to issue a decision.

In approaching the current controversy, some of the history of this ten-year-old school desegregation case should be kept in mind and bears repeating.

In April of 1976, the Buffalo Board of Education was found to have engaged in deliberate and unconstitutional segregation of the Buffalo Public School System [BPSS]. *See Arthur v. Nyquist,* 415 F.Supp. 904 (W.D.N.Y.1976), *aff'd in part, rev'd in part, remanded in part,* 573 F.2d 134 (2d Cir. 1978). After this finding of liability, the court and the parties immediately set out to devise a fair and effective program to remedy the effects of the prior unconstitutional segregation. As early as May, 1976, the court held hearings to help formulate a remedial plan. Further hearings were held throughout the spring and summer of 1976. From that time on, the court has had numerous hearings and dozens upon dozens of meetings with the parties to hammer out the details, to further refine, and to set in motion an adequate plan for desegregation.[1]

After the liability finding, the court ordered the Board to submit an initial plan for desegregation, and the Board responded by coming forward with Phase I. This plan

---

1. Indeed, throughout the remedy phase of the lawsuit, it has not been uncommon for the court to meet at least weekly with the parties and, at times, more often.

closed ten schools in an effort to save money and to integrate previously all-majority schools. In addition, Phase I opened two Magnet Schools, the Waterfront School and City Honors.

In September of 1977, Phase II was implemented. Phase II included eight Magnet Schools. Phase II was designed to insure that each school had at least 20 percent minority students in attendance.

In June of 1979, the court ordered that complete desegregation take place. The court ordered the Board to design a system-wide remedy and held that a school would not be considered as desegregated and acceptable to the court unless there was over 30 percent and under 55 percent minority population.

In November of 1979, the Board of Education submitted a proposed Phase III plan. After the decision of the United States Court of Appeals for the Second Circuit was issued in January of 1981, see 636 F.2d 905 (1981), the court ordered the Board to comply with the directives of the Second Circuit and establish a plan that could be put into effect on an expedited basis. Phase III thus became known as Phase IIIx, and its provisions were put into effect a year earlier than originally scheduled. This court approved the implementation of Phase IIIx on May 14, 1981. 520 F.Supp. 961 (W.D.N.Y.1981), and the plan went into effect in September, 1981.

The results of these efforts is the highly successful Buffalo model of school desegregation. Under the direct administration of Buffalo Board of Education Associate Superintendent Joseph T. Murray and the supervision of the Superintendent of the BPSS, Eugene T. Reville, the system has implemented several innovative programs. These programs include the Magnet Schools, the Early Childhood Centers, and the Academies.[2] In addition, the BPSS has utilized innovative concepts, such as "clustering of schools," and "feeder patterns," so that children attending any one of a number of certain schools in the lower grades will be sent to a specific high school, thus insuring that at both levels the grades will be integrated. Through implementation of these programs, the BPSS has achieved a significant success, and the programs themselves have been applauded by educators throughout the country.

A key to the success of the plan is the fact that for the most part, the integration of the schools has been achieved by voluntary means. Through the use of innovative educational techniques, the need for fixed assignments and mandatory busing of students has been kept to a minimum. There has been no disruption of the schools, no violence, and no massive "white flight" of majority students from the City.[3] Instead,

2. There are a number of examples of successfully integrated Magnet Schools flourishing in the Buffalo Public School System. In many instances, when some of these schools were first proposed, some critics predicted that the schools would fail to forward the progress of integration. Most have been successful from an integrational and an educational point of view. Some examples follow:

*Buffalo Traditional School,* Grades 5–12, with about 900 students, has 54.6 percent minority students. A very structured environment exists in this school. Formed after the court's order of May 4, 1977.

In contrast is the *Waterfront School,* with an "open concept" plan. This school has grades pre-Kindergarten through 8, with an enrollment of 885 students and 51.3 percent minority. It was formed by the court's order of July 9, 1976.

*Campus West School* is operated in cooperation with the College Learning Laboratory of the State University College at Buffalo and has an enrollment of 428 students, 47.7 percent minority.

*Build Academy* at one time was an almost all-minority school. With strong parental involvement, it now has an enrollment of 905 students, with a 52 percent minority representation.

There are many other examples of innovative Magnet Schools, including the Montessori School, the Buffalo Academy for Visual and Performing Arts, and the Buffalo Alternative School.

3. The following chart demonstrates that, while there has been a decline in the enrollment of the BPSS since 1976, the BPSS has lost proportionately fewer students than have the Buffalo Diocesan schools. This indicates that the decline is due to factors other than the integration orders.
Exhibit 794 at 5.

AN ENROLLMENT COMPARISON OF THE BUFFALO PUBLIC
AND THE DIOCESAN SCHOOLS
1976-1981

| | 1976-77* | 1977-78* | 1978-79* | 1979-80* | 1980-81* | 1981-82** | No./% 1976-81 Decline or Increase |
|---|---|---|---|---|---|---|---|
| Buffalo Public Schools | 55,167 | 53,764 | 51,325 | 49,235 | 47,907 | 46,918 | -8,249/-15.0% |
| | -1,403 | -2,439 | -2,090 | -1,328 | -989 | | |
| | -2.5 | -4.5 | -4.1 | -2.7 | -2.1 | | -3.0 average per year |
| Buffalo Diocese Schools | 17,155 | 15,775 | 14,680 | 13,617 | 12,663 | 12,054 | -5,101/-29.7 |
| | -1,380 | -1,095 | -1,063 | -954 | -609 | | |
| | -8.0 | -6.9 | -7.2 | -7.0 | -4.8 | | -5.9 average per year |

\* Ref. used BEDS
\*\* September 29, 1981 Ethnic Census Report

\*. Directory of Schools published by the Diocese of Buffalo Department of Education 1976-1981 editions.

\*\* Document received on November 23, 1981 with current enrollment figures.

the City schools have improved through the use of these programs, and the proportion of majority to minority students has remained steady, even as the population of the City has decreased.

It cannot be denied that from an educational point of view, the programs such as the Early Childhood Centers and the Magnet Schools have been successful. They have been developed with a background of solid integration effort and, most importantly, their use has been sanctioned by this court and the United States Court of Appeals for the Second Circuit.

In reviewing the Board's request for additional funds, then, we begin with the proposition that the BPSS as it currently exists, having evolved over the six years since the court's liability decision, is the preferred, acceptable method of desegregating the Buffalo schools. It is simply too late in the day to expect the Board to dismantle the existing system and set up a new structure.[4]

Through the court's extensive involvement in the case, we have become intimately familiar with the various programs and the system as a whole and are acutely aware of how their quality and reputation affect the success of Buffalo's integration efforts.[5] As this court has repeatedly stated, we have no interest in usurping the functions of the Board and could not, under any circumstances, run the BPSS. That job is left to the expertise of the Board and its staff, particularly Mr. Reville and Mr. Murray. Nevertheless, to the extent the programs affect the desegregation efforts, they are the court's concern.

The court has made clear, too, that it is reluctant to interfere in this funding dispute. As stated in the order of June 30, 1982, before this court can order the Mayor and the Common Council to provide additional funds to the Board of Education, the Board has the burden of showing that these funds are necessary to insure compliance with our orders and with the orders of the United States Court of Appeals for the Second Circuit. With this in mind, we turn to the question of whether the Board has satisfied this burden.

---

**4.** It may be that another method of desegregation—such as a system of city-wide fixed assignments—would have proven less expensive if initially implemented in 1976. In my judgment, however, the imposition of city-wide fixed assignments would not have been successful in 1976 and is not a feasible alternative at this time.

Moreover, we have no way of knowing whether that kind of program would have been more cost-effective. There is no question that the Board has made some very successful attempts to economize. The court notes that since the beginning of the Buffalo school desegregation program, the Board of Education has closed a total of 22 schools in an attempt to save money. This was done in recognition of a generally declining population in the area and a corresponding decline in school population.

**5.** That the quality of education to be received within the Buffalo Public Schools is directly related to the success of any school desegregation order is not disputed by the City defendants. One of the witnesses who testified for the Mayor and the Common Council was the Mayor's Commissioner of Administration and Finance, Mr. Richard Planavsky. Before he was appointed to his current position, Mr. Planavsky was employed as an eighth grade algebra teacher in the BPSS. The following exchange took place during cross-examination of Mr. Planavsky between the attorneys for the Board of Education and the Mayor's Commissioner of Administration and Finance:

Q What did you personally do in your involvement to implement the desegregation program of this Court?
A I did a real good job of teaching my students.
Q Well, explain what you mean by that. That is a conclusion, your conclusion?
A Well, I thought I had a very good rate, as far as my students were concerned, of passing mathematic courses. I thought that I even taught extra algebra courses, my students were able to get credit for 9th grade algebra while they were 8th graders. I think these are all things that are furthering the program.
Q You think those kinds of things further the implementation of this Court's desegregation order?
A Yes, I do.
Q Why do you think that?
A Because I think that it helps to make it a successful experience for the children in an integrated classroom if there is a high success rate, if they are getting along with one another and so on.
Tr., Vol. 2 at 71–72.

The Board's primary witness during the hearing was Mr. Joseph T. Murray, the Associate Superintendent for Instructional Services. Mr. Murray has been a witness in this case on many occasions. In addition, he is a constant participant at the meetings which take place among the parties and the court. Throughout the remedy phase, the court has found him to be a thoroughly credible witness. He is, undoubtedly, the most knowledgeable person regarding the desegregation program and its needs. At the time the Phase I Plan was proposed by the Board, there were many predictions that the reliance upon voluntary programs could not work. Mr. Murray was confident that the plan would succeed, and throughout the years, his guidance and insight have proven reliable and invaluable.

Mr. Murray testified that the Board would not be able to adequately desegregate the schools with an operations appropriation of $149,000,000. In an affidavit submitted to the court on June 1, 1982, he attached a list of projected budget cuts which would have to be made from the instructional division unless the budget appropriation was increased. *See* Affidavit in Support of May 27, 1982, Order to Show Cause, Exhibit E. This document shows that a number of the items which would have to be eliminated from the BPSS would indeed have a drastic, negative impact upon the school desegregation order.

The projected cuts include such functions as two elementary school principals, three secondary principals, central office administrators for handicapped education, helping teachers, reading and math specialists, music, art, physical education teachers, librarians, guidance counselors, 52 elementary teachers, and 37 secondary teachers. In addition, Mr. Murray stated that the BPSS would be forced to eliminate 53 pre-Kindergarten teachers and 70 Kindergarten teachers, thus effectively ending the successful Kindergarten and pre-Kindergarten programs.

In any school system, budgetary cuts of this nature would have a serious impact upon the quality of the school system. If these cuts were to go through as anticipated, there is little doubt that they would have a deleterious effect upon the quality of education offered to the school children of the City of Buffalo. This is especially unfortunate in light of the recent progress made in the quality of education and in the fact that the reading scores and general performance scores of the school children have been steadily improving over the past few years. If this were the only impact, the court could not intervene in this controversy. The Board has demonstrated, however, that these cuts would have a serious negative impact upon the desegregation orders of this court.

In the opinion of Mr. Reville, Mr. Murray, and the other educational experts of the Board and its staff, the highly successful Kindergarten and pre-Kindergarten programs are a crucial part of the desegregation effort. The City has suggested that the Board "could go a long way towards living within its appropriation by eliminating pre-Kindergarten and all-day Kindergarten." *See* Brief of the Mayor and the Common Council at 18. The Mayor points out that these programs are not mandated by the Commissioner of Education and that Buffalo has a disproportionately high ratio of students attending these programs, far more than in comparable cities such as Syracuse, Rochester, New York City, or Yonkers. This suggestion of the City completely misses the mark. None of the other cities has the same need to offer full-day Kindergarten or pre-Kindergarten classes in order to attract majority students to implement a school desegregation program. The City has seized upon a list of items supplied to Mr. Richard Planavsky, the Mayor's Commissioner of Administration and Finance, by Mr. Murray, setting out those items which are and are not mandated by the Commissioner of Education (see Exhibit attached to supplemental affidavit of Richard Planavsky) and has apparently taken the view that anything not mandated by the Commissioner of Education may be eliminated in order to save money. This, however, is not an accurate or realistic view of the situation. While the Commissioner of Edu-

cation is by statute the authority dictating the minimum requirements for the educational system, there are many other obligations which bind the Board and hinder its ability to freely control its expenditures. The Board is obligated to comply with the orders of this court and with various state and federal statutes and regulations, including those recently enacted regarding handicapped children.

Under federal and state law, handicapped students must be afforded the maximum opportunity for integration with non-handicapped students. *See* 20 U.S.C. § 1412(5)(B); Rehabilitation Act of 1973 § 504, 29 U.S.C. § 794; 20 U.S.C. § 1401(18); 34 CFR § 300.550, § 300.4, § 104.33. In educational jargon, the placing of handicapped students with non-handicapped students at every possible opportunity is called "mainstreaming" of the handicapped youngsters. Under the law, the school district has the responsibility to provide an appropriate education designed to meet the individual needs of each child. This law is applicable to the school district without regard to the finances available to the Board.

In addition to the federal and state laws and regulations, the Board is also bound by this court's orders in two pending cases, *Andres v. Reville,* Civ. 80–482, and *Bushey v. City of Buffalo Board of Education,* Civ. 81–254.

A consent order was issued in the case of *Andres v. Reville* in May of 1982. During the hearing, both Mr. Murray and Mr. Reville testified that the reduction in the teaching staff, which will be required unless additional funds are forthcoming, would be a violation of the consent decree in the *Andres* case and would also place the school in jeopardy of violating the federal and state law.

For example, the records show that in the case of children who are severely physically handicapped, it may be necessary to have as few as six children in a classroom, which requires the Board to hire additional staff because these children cannot care for themselves and need both the assistance of the teacher and an aide if they are to receive an adequate education. *See* Tr., Vol. 6 at 144. Moreover, the consent order in the *Andres* case requires that an

adequate number of supervisory personnel shall be assigned to the TMR program. Further, a sufficient number of aides and professional staff shall be utilized to accomplish the matters and principles set forth in this agreement. Adequate and appropriate in-service training shall be established and provided to said aides and professional staff.

*See* Civ. 80–482, Order of May 27, 1982.[6]

There is no question that compliance with these laws will cost the Board a great deal

---

**6.** *Andres v. Reville,* Civ. 80–482, involves trainable mentally retarded [TMR] school children. The students involved in *Bushey v. Board of Education* are all handicapped school children plus all those suspected of possessing a physical, emotional, or mental handicap.

What constitutes a sufficient number of aides and teachers has been defined more specifically in the agreement stipulated to by the parties also on May 27, 1982, which has been filed with the court and made a part of the *Andres* case. Paragraph 11 of the agreement provides that:

As a result of the increase in individualized objectives and community-based training, and based upon the present enrollment, the staffing in the TMR program shall be at the following levels:
(a) At School 45—5 teachers and 2 aides
(b) At Buffalo Traditional—5 teachers and 3 aides
(c) At McKinley—4 teachers and 2 aides

(d) At OTC—staffing shall remain the same

These figures are deceptively small. This order relates only to the trainable mentally retarded children and does not at all cover the much larger class of learning disabled, physically, and emotionally handicapped children. The record shows that at this time, it is impossible to ascertain exactly how many of those children there are in the BPSS. And, indeed, one of the objectives of the *Bushey* case is to establish a program within the school system which would identify, test, and categorize those children needing special education.

Other aspects of the regulations regarding handicapped needs require that the Board provide various special classroom settings called "resource rooms" in order to mainstream children with learning disabilities. A child afflicted with a learning disability can spend the majority of his or her day in a classroom with non-handicapped children and can have access

of money. And, indeed, many of the increases in the school budget were for implementation of these regulations, orders, and laws regarding handicapped children.

Another "non-mandated" commitment of the Board is the requirement that non-English speaking children or children who have limited English proficiency receive an adequate education. There are a significant number of children in the City who do not speak English at all, or who do not speak it sufficiently well to attend classes given in English. Therefore, the Board must provide classes where instruction is given in a variety of languages.

In particular, there is a large number of Spanish-speaking children in the City. The Hispanic intervenors entered the case in 1977 and have endeavored to protect the interests of these children. The City is on record as being opposed to the creation of two new positions within the system which the Board claims are necessary to enable the Board to comply with the court's orders regarding Hispanic school children. One would be stationed at Grover Cleveland High School and the other at the Herman Badillo Community School. Both of these schools have a disproportionately large number of children who lack significant English skills. Therefore, it is essential that the Board provide bilingual personnel so that the school officials and teachers will be able to communicate with the school children and their parents.

In addition, as the Hispanic intervenor has pointed out, the Board is committed to the expenditure of certain funds through operation of the federal grant system. That is, in requesting and receiving federal funds over the past few years, particularly with regard to certain bilingual programs and programs for the Native American students, the Board committed itself to supply certain services to the students who would take advantage of these classes. In making the application for federal funds, the Board was required to make assurances that the programs would continue to be provided regardless of whether the organization making the application continued to receive federal funds. Therefore, although certain federal funds have been lost, the Board is nevertheless obligated to provide these services to the school children. See Tr., Vol. 1 at 70–71, Vol. 5 at 124–26. This, then, constitutes an additional drain upon the Board's financial resources, and one which must continue to be met by the Board out of its operating funds, even if the federal funds are not forthcoming.

Yet another obligation is imposed on the Board by operation of the collective bargaining agreements which are in effect between the Board and many of its employees. Much has been made of the fact that teachers and administrators are to receive a six to seven percent increase in pay for the next school year.

The court notes initially that the salary increases for the year commencing July 1, 1982, consist of a six percent across-the-board increase. In addition, for teachers with a high level of experience, above the fourteenth step, there is an additional one percent increase. This wage increase, and the previous increase for the year July 1, 1981—June 30, 1982, were negotiated and agreed upon as part of the usual collective bargaining process. The terms of the agreement, which were negotiated in 1981 to cover the two years, are public knowledge and were known to the Mayor and the Common Council.

As the record demonstrates, the negotiated increases are not overly generous, and they are comparable to the wage increases received by City employees. Indeed, de-

---

to the resource room or to a special self-contained classroom for those subjects in which he or she needs special tutelage, or for those periods of the day when he or she needs special attention. The child's regular classroom teacher must be involved in planning the curriculum for the handicapped child. This, of necessity, creates a larger burden for the classroom

teacher, particularly since the average student-teacher ratio is above the norm within the BPSS. Because of the additional demands of the teacher's time, it is understandable that the Board would request the additional teachers and the additional aides, in particular, to effectuate these rules and regulations. See Tr., Vol. 6 at 140–45.

spite the Mayor's contentions to the contrary, the record shows that disregarding automatic increments for increased qualifications or step increases, the yearly percentage raises for the Buffalo teachers have been smaller than those allocated to City white collar workers and police officers and firefighters over the past two years.[7] One of the main reasons for the increased costs for which the Board is seeking additional funds is the Board's proposed hiring of 125 new teachers and 46 additional teacher aides. As noted above, however, many of these new positions are necessary to implement the regulations regarding handicapped children.[8]

Further, just as some positions are necessary to enable the court to comply with the court's orders in the *Bushey* case and with federal and state laws, so too are other positions, such as bus aides, obviously necessary to implement the desegregation order.

The City's position is, basically, that these positions are not mandated by the Commissioner of Education of the State of New York; therefore, they are not necessary. However, as we have stated, the desegregation system has worked because of the voluntary aspects of the system. Parents volunteer to have their children sent to certain schools, in part because of the high quality of education the children will receive and also because they are assured the children will be well cared for. Some of the children who board buses for the Early Childhood Centers or for the Montessori schools are quite young. Clearly, these children are incapable of watching for their stops, of knowing when and where to leave the bus. An aide is required to insure that the child gets off at the right bus stop and also to insure that someone is there to receive the child. Without the assurance that there will be someone to care for the child, the Board fears, and with some justification, that the parents will be reluctant to let their children board the buses.

Moreover, the need for increased funds to hire more teacher aides and bus aides is evident, because although a smaller student population is projected for the coming school year, more children will be transported than last year.

With regard to the number of teachers employed by the Board, it is evident that here, too, a decrease in the number of teachers—both classroom teachers and teachers in special classes—is relevant to the success of the desegregation program.[9]

7. This subject was covered at length during the hearing. While there was some initial confusion regarding the precise figures, they were made clear by exhibits submitted by the Board. *See* Tr., Vol. 2 at 161–67; Vol. 3 at 72–75; Exhibits 774, 775, 776.

8. During the hearing, Mr. Murray testified that, of the 46 additional aides, the Board already is paying for 23 aides from other sources which are no longer available. Mr. Murray stated that the aides are used to provide services to handicapped youngsters. The 23 aides who are currently employed are used in the Academies and in the Early Childhood Centers in particular, to assist the teachers and to help give the individualized attention necessary to the handicapped child. He testified that the additional aides will be used to provide equity in the Academies and the Early Childhood Centers so that the handicapped children will have the same programs and will be able to take advantage of currently existing programs in the same manner as non-handicapped children. *See* Tr., Vol. 1 at 60–61.

9. There has been some discussion regarding the number of teachers in the BPSS and the teacher-pupil ratio in the System compared to other school districts. During the hearing, the attorneys for the Mayor produced a copy of a newspaper article which had been printed in a local newspaper. This newspaper article presented statistics comparing the pupil-professional ratio and the pupil-teacher ratio of Buffalo and numerous other counties and cities. The statistics showed that the BPSS has more professionals per pupil than is average among county school districts and among districts within the State. The same is true with regard to the pupil-teacher ratio. The conclusion which the City drew from these figures was that the class size in Buffalo was smaller than average throughout the County and throughout the State. From this, the City defendants concluded that significant savings could be achieved by increasing the small class size.

Mr. Reville disagreed with both of these conclusions. The Superintendent explained the figures in the newspaper article during the hearing and also explained that the pupil-teacher and pupil-professional ratio did not mean that Buffalo's class size was smaller on the

Once again, we must emphasize that because of past orders of the court and the history of the litigation, the City as well as the Board have committed themselves to a continuation of the integration program started with Phase I and continuing through Phase IIIx and the concept of Magnet Schools and Early Childhood Centers.

Small classroom sizes or the assistance which an aide can give to a teacher within a classroom is, in the opinion of the educational experts of the Board, an integral part of these programs. In response to the question whether the Board could continue to successfully operate its program next year without additional staff, Mr. Murray's answer was unequivocal. He said, "We cannot." Tr., Vol. 1 at 64.

Another very serious problem facing the Board this year is the dramatic decrease in the amount of federal aid the BPSS has been receiving. Mr. Reville testified that the BPSS receives more federal aid than any other school district of comparable size in the country and that many of these funds are used for desegregation. Tr., Vol. 5 at 167. The record shows that for school year 1982–83, these funds have been slashed severely.

With the passage of the Education Consolidation and Improvement Act of 1981, as part of Title V of the Omnibus Budget Reconciliation Act of 1981, Pub.L. 97–35, Congress consolidated a number of programs, including the Emergency School Aid Act, 20 U.S.C. §§ 3191–3207, under which the Board received a large amount of desegregation funds, into block grants to be distributed to the states.

The Board has lost a substantial amount of funds, over $10,000,000, because of changes in the law. The issue was discussed during the hearing. Mr. Murray and Mr. Reville testified that despite the devastating effect of these cuts, the Board did not ask the City to replace the lost funds. The Board's bottom line figure of $156,500,000 reflects significantly smaller amount of actual funds available for desegregation over what the Board received last year.[10] Tr., Vol. 1 at 23–25; Vol. 5 at 14–20.

While the Board did not and does not now ask the City to replace these desegregation funds, the cutbacks are relevant to the issue of the Board's need for more funds. The anticipated losses were made known to the Mayor and Common Council during the budgetary process, and the City defendants were kept informed. It is evident from the record that the Board will need far more funds to operate the schools and carry on the court's desegregation order than it had available last year. Upon review of the entire record, the court accepts the expert opinion of the Board staff that $149,100,000 will not be sufficient to enable the Board to desegregate the schools. The court finds that the Board has

average than other districts. On the contrary, Mr. Reville testified that Buffalo's classroom size was in fact the largest in this area.

Mr. Reville explained, first, that the figures cited in the article were based upon a budget which included some $20,000,000 to $25,000,000 of federal funds which would be seriously reduced. The fact that the federal funds will be lost, Mr. Reville stated, will increase the staff ratio most likely to a degree higher than that of the other schools stated in the article. In any event, the classroom size is currently higher than the suburban schools, and the highest in the County. The master contract entered into between the Board and the Buffalo Teachers Federation states that the classroom size shall not exceed 33 students. Tr., Vol. 5 at 175, and the record shows that the average size for a class of elementary school children was 28 students during school year 1981–82 (see Attachment C to Mr. Murray's Affidavit of June 3).

It is apparent from the record that the City defendants have simply misconstrued the figures in equating pupil-teacher ratio with class size. Mr. Reville and Mr. Murray have explained adequately that the pupil-teacher ratio is not any kind of representation of class size, because it reflects as well special reading teachers, special math teachers, handicapped teachers, and those teachers which are provided for by the federal funds, such as teachers employed by the Performing Arts Academy to teach drama and music, etc. The same is true for the professional-pupil ratio.

10. Mr. Murray and Mr. Reville stated that if the Board included the amount of lost federal funds, its budget request would be in excess of $169 million for operations and maintenance funds. Tr., Vol. 1 at 26; Vol. 5 at 153–54.

carried its burden of demonstrating that additional funds are required and that they are "necessary to cure the effects of prior unconstitutional school segregation." *Oliver v. Kalamazoo Board of Education,* 640 F.2d 782, 787 (6th Cir. 1980). The court shall therefore order the City to make available an additional $7,400,000 to the Board on or before June 3, 1983, so that the Board shall have sufficient funds at its disposal to implement the orders of this court.

The Mayor characterizes the Board's request for the funds as an application for a mandatory injunction, in which remedies are issued under compelling circumstances, *citing Citizens Concerned, etc. v. City and County of Denver,* 628 F.2d 1289, 1299 (10th Cir. 1980); *Holy Spirit Ass'n v. Town of New Castle,* 480 F.Supp. 1212 (S.D.N.Y. 1979). The court has considered these cases and finds that they are inapplicable to the instant case for many reasons. The fundamental and crucial point which the Mayor overlooks is that he and the Common Council have been defendants in this school case since its inception and have had a continuing duty to stay informed about the needs of the school district and act in partnership with the Board in making available sufficient funding. Also, as the court has already explained, the Mayor and the Common Council have the obligation under New York State law to fund the schools.

In each of my prior orders, it was made clear that the burden to desegregate the schools falls not only upon the Board of Education but also upon the Mayor and the Common Council. That the Board has been in the vanguard of the attempts to formulate an effective remedy is, as a practical matter, a necessary development. Nevertheless, we must keep in mind that the City and the Mayor, too, were defendants in the original lawsuit.[11]

As a defendant, it is the duty of the Mayor and the Common Council, as well as the Board, to insure that the schools are effectively and completely desegregated. As the chief executive officer of the City and as chief fiscal officer, the Mayor has the affirmative obligation of assuring that there are adequate funds available to guarantee that this is possible. It was the Mayor's duty to keep informed of the court's orders which directed the Board to implement various integration programs and to assess the impact these orders would have upon City finances. The Mayor's task as codefendant in the lawsuit was to familiarize himself with the needs of the Board, *vis-a-vis,* the desegregation program. He should have affirmatively inquired as to what was necessary, what the program entailed, what were the Board's needs with regard to those programs mandated by other court orders and by the state and federal regulations. The focus of his inquiry should have been: how much money is necessary to enable the Board to carry out the mandates of this court and its other commitments? It is clear from the testimony that the Mayor failed to make any such inquiries.

The record indicates that, except for attending the formal presentations made by Mr. Murray and Mr. Reville during the public hearings, neither the Mayor nor any member of his staff made an effort to ascertain exactly what was needed to carry

11. The Mayor's predecessor in office, the late Frank A. Sedita, was found to have been not guilty of racial discrimination in the original liability decisions. There is no question, however, that Mr. Sedita's successors remained in the lawsuit in their official capacities. Indeed, this very issue arose last year, after the court issued an order in May of 1981 directing the Board to implement Phase IIIx.

In June of 1981, the Mayor sought clarification as to his status in the lawsuits so that he could appeal the court's decision regarding Phase IIIx. At that time, the court stated:

The court finds that the Mayor is a party to this lawsuit. Under Rule 19 of the Federal Rules of Civil Procedure, a person shall be joined as a party in an action if in his absence complete relief cannot be granted. Since it has been necessary to order the defendants to implement a desegregation plan, it is clear that the Mayor, as a key fiscal officer of the City, is an essential party. *See* Order of June 8, 1981, at 1–2. The Mayor's status as a defendant was recognized by the United States Court of Appeals for the Second Circuit when it heard oral argument on his appeal and subsequently rejected it.

out the desegregation orders. That the Mayor could have obtained the information is evident from prior events in the case.

As stated above, a similar funding dispute arose last year and ended with a consent order directing the payment of additional money. As part of the order, the Board and its staff were directed

> to fully cooperate with the Mayor of the City of Buffalo and his representatives in reviewing the operation, finances and activities of the Board, such cooperation shall include giving all information and reports reasonably requested by the Mayor or his representatives including materials generated by outside auditors of Board finances and said auditors shall be instructed by the Board to supply information and reports reasonably requested by the Mayor or his representatives . . . .

Order of August 14, 1981, at 2. This provision of the order was added at the insistence of the Mayor over the objections of the Board. The Mayor could have obtained any information desired through utilization of his Board of Education Review Committee.

Yet, at the time of the hearing in July, the Committee had not submitted reports. Moreover, the Mayor testified that no recommendations from the Committee came to his office. He also stated that, while he was kept informed in general terms of the meetings by Mr. Planavsky, he never reviewed the minutes of the meetings and "didn't learn much" about the Committee's recommendations. Tr., Vol. 3 at 67, 68.[12] None of the consultants hired by the Committee was called by the City to express his or her opinion regarding the needs of the Board, and it does not appear that the Mayor made use of this resource. This lack of inquiry is especially curious in view of the City's insistence upon the establishment of the Committee last year.

One of the primary witnesses for the City defendants during the hearing was Mr. Planavsky. When asked whether or not he took the school desegregation needs into account, Mr. Planavsky responded in the affirmative. It was clear from the testimony, however, that he, as well as the Mayor, eschewed a thorough investigation of the desegregation program and, instead, employed a mechanical formula in arriving at the amount of funds for the Board's operations and maintenance budget.

In making the specific allocation of funds to the Board, the Mayor and his staff worked upon two assumptions. The first was that the Board was just another department of the City and subject to the same limitations regarding the lack of funds. The second assumption was that the Board had been able to function adequately throughout all the prior years of the desegregation order. Therefore, there could be no reason to award the Board a proportionately larger increase in funds this year than it had received last year and the year before.[13] The record shows that the Mayor

---

**12.** The reports of the consultants hired by the Mayor's Board of Education Review Committee were made available to the court sometime after the hearing was closed. In an order dated August 13, 1982, the court held that the reports would not be considered as part of the record because they were not available during the hearing and the consultants who prepared them were not available for cross-examination.

The court notes, in addition, an unsolicited reply brief was filed by the City defendants on August 17, 1982. Because it was the understanding of the court and the other parties that reply briefs were not warranted, none of the other parties has submitted responding documents.

Finally, on August 18, 1982, the court received a document from the City defendants entitled "Motion of the Mayor and the Common Council to Correct the Record."

It may be that these various documents contain useful information, and the consultants' reports should be of assistance to the Board and the City defendants in preparing their budget requests for next year. As far as the instant application is concerned, however, the record must be closed. With the BPSS scheduled to begin its 1982–83 school year on September 8, time is clearly of the essence. Therefore, rather than spur a second round of briefing, the court did not consider the arguments raised in the reply brief of the City defendants. Further, the court finds that the motion to correct the record is unnecessary, and it shall be denied.

**13.** Mr. Planavsky stated:

and his staff intended to award the Board approximately 92–93 percent of whatever amount the Board requested or, in the alternative, give the Board a 5.5 percent increase over last year's budget.[14] This figure was one of the items taken into account by the City. During the hearing, Mr. Planavsky stated:

> [W]e looked at, generally speaking, we looked at what revenues were available. We looked at the needs of the Board of Education and then we used comparability and then based on those, generally speaking, we made our decision.

Tr., Vol. 2 at 62.

Mr. Planavsky was not very specific about the other information he took into account. (Tr., Vol. 2 at 64–72.) He produced a document which he said he used to analyze the Board estimate. (Exhibits 769 and 770.) His principal approach, however, was to slash all new jobs without finding out why they were requested. He stated:

> [W]hen I went through the Board's budget, I took all of the new jobs and I put them on my list here, because I thought that if it was a new position, and there were about three hundred of them, I didn't think they could possibly need three hundred new jobs.

Tr., Vol. 2 at 66.[15] From the record, it appears that the statement reflects the general attitude of the Mayor and his staff in performing their tasks. Funding was denied for new positions notwithstanding the impact of the denial of the funds on the desegregation effort.

This is supported by the testimony of the Mayor, who stated that in arriving at the $150,000,000 figure for Board use, he took into account the declining enrollment of about 1,185 pupils, the money that the Board was to receive from the State government, and the amount to be received by the tax levy in the City of Buffalo. Tr., Vol. 2 at 171. He stated that he "took into consideration State aid, the property taxes, the sales taxes and my other departments." Tr., Vol. 2 at 212. Nowhere in his consideration is there any indication that the Mayor took into account the specific needs of the Board regarding the increased cost of complying with the desegregation order in the face of dwindling federal funds and the need for increased funds to comply with this court's orders in the *Andres* and *Bushey* cases regarding handicapped children. Even though it was his duty as a defendant to inquire into these areas, the Mayor operated under the assumption that the Board would take care of it all with an increase limited to a certain percentage over what it received last year.

---

> [T]his desegregation order of the Court has been carried out and, of course, we have been funding this all along. One thing that I had in my mind was the understanding that the Board of Education has in past years asked for a considerably higher figure than they have in fact received, and that the average of this has been in the neighborhood of about ninety-three percent; in other words, they have received about ninety-three percent of what they have actually asked for.

Tr., Vol. 2 at 6.

> The Mayor stated:
> They asked for a hundred sixty point two million dollars, and we gave them ninety-two point eight percent of the money they requested. This is in comparison with all of the years that I have been Mayor; this is about the average of the monies that they received.

Tr., Vol. 2 at 177.

> An alternative approach which the Mayor appeared to have utilized was to use the budget from last year as a base and add 5.5 percent of last year's allocation to that figure. *See* Tr., Vol. 2 at 185–87, 188–89.

14. Neither of these approaches would give the Board the desired increase in funds over last year's budget. This is because the base figure used by the Mayor did not reflect the amount of money actually used by the Board, including the large sums of federal aid which, as we discussed, are no longer available. Had these funds been included, the Mayor's $150,000,000 recommendation would be far less than 92–93 percent of the Board's request. Tr., Vol. 5 at 21–23.

15. Some of the positions which would have been eliminated include the additional teachers and teachers' aides, bus aides, and coordinators for bilingual programs. This approach of automatic elimination of any new position demonstrates Mr. Planavsky's disregard for the Board's needs, his lack of knowledge of the Board's needs, and his disregard for its commitments—including the desegregation program.

In fact, as the testimony shows, the City reduced the amount of City revenues available to the Board of Education.

| REVENUES FOR SCHOOLS | | | CHANGE | |
|---|---|---|---|---|
| | 1981–82 | 1982–83 | Dollars | Percent |
| OPERATIONS & MAINTENANCE | | | | |
| City Tax Levy | $ 38.8 | $ 38.3 | $–0.5 | –1.29% |
| Other | 5.4 | 5.4 | – | – |
| State Aid | 84.7 | 93.3 | 8.6 | 10.15 |
| Sales Tax | 11.2 | 12.5 | 1.3 | 11.61 |
| Miscellaneous | 0.6 | 0.5 | –0.1 | –16.67 |
| Court Order | 2.0 | 0.0 | –2.0 | –100.00 |
| Subtotal O & M | $142.7 | $150.0 | $ 7.3 | 5.12% |
| DEBT SERVICE | | | | |
| Tax Levy | $ 5.9 | $ 6.5 | $ 0.6 | 10.17% |
| Other | .7 | .5 | –0.2 | –28.57 |
| Subtotal Debt Service | $ 6.6 | $ 7.0 | $ 0.4 | 6.06% |
| GRAND TOTAL | $149.3 | $157.0 | $ 7.7 | 5.16% |

Exhibit 794 (emphasis by underscoring added).

As the table indicates, there has been a reduction in local effort to support the BPSS and the desegregation program. Instead of providing an additional $8,000,000 more to the Board, as the Mayor claimed, the Board's share of revenues from the City's tax rolls is actually approximately $500,000 less than last year. The $8,000,000 increase for which the City takes credit comes from New York State aid which the State designates specifically for Board use.

Further evidence which shows that the Mayor did not perform his duty of inquiring into the desegregation needs of the Board is found in the fact that he was cautious in making up the budget and acknowledged other legal obligations of the City. The Mayor set aside substantial sums in reserve accounts to cover potential liability of the City from decisions which may be forthcoming from collective bargaining arbitrators and from the state courts.

The record shows that approximately $2,200,000 has been placed in a reserve account to cover any judgments that may be taken against the City for 1982–83. The Mayor testified that the money was allocated to insure that there would be adequate funds available to satisfy judgments which may be awarded to taxpayers whose property has been over-assessed and who sue under the decision of the New York State Court of Appeals in the case of *Hurd v. City of Buffalo,* 41 A.D.2d 402, 343 N.Y.S.2d 950, *aff'd,* 34 N.Y.2d 628, 355 N.Y.S.2d 369, 311 N.E.2d 504 (1974).

Yet, many cities in the State face the possibility of similar judgments being taken against them. As was noted by the Board, however, local municipal governments adversely affected by the *Hurd* decision can expect to receive assistance from the State of New York in meeting these obligations. *See* Post-Hearing Brief of the Board at 18, and Exhibit A attached thereto.

In addition, there is another way in which the City could meet its obligations without endangering the success of the desegregation program, and that is by issuing short or long-term obligations. During the hearing, the Mayor stated that he is reluctant to borrow funds to pay the *Hurd* judgments, and there is no doubt that the Mayor's generally unsympathetic attitude towards debts has benefited the City.

The Board has provided the court with a memorandum from the New York Senate Finance Committee's Office of Fiscal Studies, dated May 14, 1982, which pertains to Buffalo's fiscal situation (Exhibit A to the Board's Proposed Findings of Fact and Conclusions of Law). The report states that the City has

> reduce[d] its cumulative deficit from $37.5 million in June of 1975 to almost zero this year—quite a feat for a unit of government located in an area of the State experiencing severe economic contractions.

A substantial part of this reduction occurred during the present Mayor's term of office through his efforts and those of his staff.

Nevertheless, the same report noted with disapproval the Mayor's $4,700,000 in budgeted reserves because none of them, including the $2,000,000 judgment reserve, is an "absolute necessity." *Id.* at 3–4. In addition, the Mayor has set up a second discretionary reserve fund in the amount of $1,500,000 for salary negotiations.

Throughout this dispute, the City has emphasized the fact that City Fire and Police Department employees are to receive a salary increase of only 2 percent of current salaries for fiscal year 1983. *See* Affidavit of the Mayor, Tr., Vol. 2 at 133–35. In fact, however, the Mayor is well aware that this 2 percent figure represents the City's offer and not a final resolution of what it will have to pay these employees. Pursuant to the New York State Taylor Law, the collective bargaining agents for the police officers and the firefighters are entitled to seek binding arbitration for wage disputes.

The Mayor testified that the negotiations for a new contract for the Buffalo firefighters have already reached an impasse and, while it is not certain, there is a distinct possibility that the police officers' union will be dissatisfied with a 2 percent wage increase and will also take the matter to binding arbitration. He acknowledged that the City will have to honor whatever increase is eventually awarded to the public employees by the public arbitration panel. And, if the Mayor has underestimated the amount of wage increase awarded by the arbitrator and the money in the reserve account is insufficient, the City may have to borrow money to pay for the increase. Certainly, the obligation of the City to fund the desegregation program is equally important, and the City may borrow to pay for this obligation also.

Judgments, court orders, and arbitration decisions are not foreign to the Mayor and, in setting aside these reserve funds, he has acknowledged the City's obligation to follow court orders. In contrast to his recognition of the binding nature of the *Hurd* decision and an arbitration award, the budget does not contain a reserve account to provide additional desegregation funds if required by this court.

This decision is not intended to be an exhaustive review of all the arguments raised by the parties during the hearing and in their post-hearing briefs. Instead, the court shall note that, in addition to the issues discussed, we have carefully considered all of the arguments and objections raised by the Mayor and the Common Council during the hearing and in their post-hearing brief. These arguments do not change our holding that the City must provide an additional $7,400,000 to the Board.

Some arguments of the City defendants, however, require brief discussion. The first involves the Mayor's contention that the Board's application for additional funds is premature. This is based on the City's argument that the Board should first prepare a formal, line-by-line budget to show that it could not operate within the $150,600,000 currently allocated. Until this task is completed, the City defendants argue, they and the court have no way of knowing whether items can be cut which would not harm the desegregation program.

Under the New York State Education Law, the Board must "prepare annually an itemized estimate for the current or ensuing fiscal year of such sum of money as it may deem necessary . . . ." New York State Education Law § 2576. The Board has no power to appropriate funds but is dependent upon the City to finance its expenditures. Under the State law, however, the City cannot dictate to the Board how these funds should be spent. That decision is left to the expertise of the Board and its staff.

To require the Board to prepare a second itemized estimate and to allow the City defendants to examine the budget on a line-by-line basis, directing the Board to cut out one program or another, or to cut back on certain expenditures as opposed to others, would give the Mayor and Common Council greater control over the educational system than is contemplated under the State law.

Further, the court finds that an itemized estimate is not necessary for our decision today. The Board's burden was to show that additional funds must be provided in order for the Board to desegregate the schools. The Board has adequately demonstrated that the cost of desegregating the schools and complying with other orders of the court has increased considerably and that, in the face of a sweeping cutback of

federal aid, funds from its codefendants have not been forthcoming. The holding of our decision today remains intact. The Board has carried its burden.[16]

Another prong of this argument is the City's contention that the Board should have followed the procedures of Education Law § 2576(6) which provides:

A board of education may, to meet emergencies which may arise, submit a special estimate in which items for extraordinary expenses may be submitted to meet such emergencies. Such estimate shall contain a complete statement of the purposes for which the items are requested and the necessity therefor. The same method of procedure shall be followed in submitting such estimate and such estimate shall be subject to the same consideration and action as is required in the submission, consideration and action upon the regular annual estimate submitted by a board of education. The common council or other legislative body in such city shall have power to make the appropriations requested by a board of election in such special estimate.

The court rejects this argument also. We note first that it is not clear that section 2576(6) is applicable to this case. It may be intended to apply only to emergency situations which arise during the school year, such as natural disasters, and not to situations which are foreseeable, such as a collapse of the BPSS and the desegregation program due to a lack of funds.

Secondly, it is clear that the Board has made application for increased funds to the City. The City has been informed of the developments regarding federal aid cutbacks and increased needs and has refused to advance additional funds. It would be futile for the court to require the Board to make yet another application for the same relief.

The next issue involves the surplus of funds from the last school year that the Board allegedly has at its disposal. There has been much discussion by the City defendants regarding these extra funds. It is sufficient to note, however, that there is no evidence in the record to indicate that the Board has, or will have, a surplus of funds when the final fiscal accounting is rendered.

Similarly, while there was a great deal of discussion during the hearing regarding the possibility of the Board's use of capital funds to supplement its operations and maintenance budget, the record shows that this cannot be done. The Board has demonstrated that the uses to which these funds can be made are limited. They may be utilized for construction and reconstruction of facilities but not for repairs and maintenance of school buildings. Tr., Vol. 4 at 136, 138–42.

■ The final issue remaining for decision is the plaintiffs' motion for further desegregation. Plaintiffs have submitted a proposed plan to bring the six elementary schools remaining outside the court's guidelines into compliance with our orders. The Board has opposed this plan. The Board's position is that given the size and racial makeup of the school children of the City, adoption of the plaintiffs' plan would cause schools which are now racially balanced to be thrown outside the court's guidelines.

This issue was explored in depth during the hearing. In support of their motion, plaintiffs relied upon the testimony of Mr. Murray. Mr. Murray stated his position as being opposed to any additional pupil redistribution at this time.

Opposition was also voiced by the intervenors representing the class of handicapped children in the BPSS. According to the intervenor's analysis as set forth in its posthearing brief, plaintiffs' plan would be detrimental to trainable mentally retarded children and would inhibit compliance with the consent degree rendered in the *Andres* case.

16. We note, in addition, that it is not practically feasible to require the Board to prepare the kind of detailed, itemized budget the City defendants request. Schools are scheduled to open on September 8, 1982, a very short time away. The motion was brought and the hearing conducted in an expedited fashion in view of the sharp time constraints.

Having reviewed the plan submitted by the plaintiffs, the testimony from the hearing, and the submissions from the parties and the Hispanic and Handicapped Intervenors, the court is convinced that the plaintiffs' plan should not be implemented. The record shows that the plan would be financially burdensome, disruptive, and, most importantly, it would not significantly benefit the desegregation effort. The plaintiffs' motion is therefore denied.

The court notes that in our order of June 30, 1982, we stated that "[a]fter the hearing, we hope to be in a position to issue a final order, ending the court's role in *Arthur v. Nyquist.*" We now find that it is not possible to do so at this time. Although plaintiffs' proposal has been rejected, there are schools which remain unbalanced. When the Board made its representations regarding its plans for the coming year, its representatives assured the court that the Board's staff would continue to review the data and determine whether additional remedial action is feasible. *See* Order of May 5, 1982. Further, the specific needs of the handicapped and Hispanic school children must be addressed, and the interrelationship of these special needs and special programs, within the desegregation order. Clearly, there will be further meetings and future orders in this case. For the present, the court holds that the Board's plans for school year 1982–83 shall be implemented as scheduled on September 8, 1982.

To summarize, the court grants the application made by plaintiffs and supported by the Board and directs the Mayor and the Common Council to make available to the Board an additional $7,400,000. The motion of the plaintiffs to modify and amend the plan is denied.[17]

So ordered.

17. At this time, it may be useful to look ahead to next year and the years thereafter. It is obvious that the limited role of the court ought to and must come to an end. This order was issued most reluctantly, and only after carefully considering possible alternatives. It was only done because it was absolutely necessary to carry out prior orders of this court and the United States Court of Appeals. It cannot be said that a similar order will be appropriate next year or thereafter.

In the coming months, it will be the obligation of the Board and staff to inform the Mayor, his fiscal officers, and the Common Council of its perceived needs for the future. It is the obligation of the Mayor and others to question reasonably and to become informed about the problems the Board has in providing educational services within the law and the mandate of the court. Last year when the Mayor insisted upon the formation of a committee to review Board practices, the court agreed that it was a good idea and made its formation a part of the order, over the objection of the Board. I still believe that the committee can perform a useful function, but its success depends upon the good will and cooperation of all concerned. It certainly is the responsibility of the Board to continue to review and analyze its procedures with an eye to providing an appropriate education to the students as economically as possible.

Lastly, although the necessarily imposed series of integration orders have placed added burdens on our City, there have also been substantial benefits to the students and to the community at large. Good schools are integral to the civic health. Continued improvement will result from understanding and cooperation.