George ARTHUR et al., Plaintiffs,

v.

Ewald P. NYQUIST et al., Defendants.

No. Civ–1972–325.

United States District Court,
W. D. New York.

May 19, 1981.

---

Jay, Klif & Morrison, Buffalo, N. Y. (David G. Jay, Buffalo, N. Y., of counsel), for plaintiffs.

Joseph P. McNamara, Corp. Counsel of the City of Buffalo, Buffalo, N. Y. (Aubrey McCutcheon, Sp. Counsel, William E. Carey, Asst. Corp. Counsel, and James P. Caher, Deputy Corp. Counsel, Buffalo, N. Y., of counsel), for Mayor James D. Griffin, Superintendent of Schools Eugene T. Reville, The Board of Education, and the Common Council of the City of Buffalo, defendants.

James A. W. McLeod, Buffalo, N. Y., for plaintiff-intervenor Citizens for Quality Education.

Jaeckle, Fleischmann & Mugel, Buffalo, N. Y. (J. Edmund deCastro, Jr., Buffalo, N. Y., of counsel), for plaintiff-intervenor Puerto Rican Legal Defense and Education Fund.

Serotte, Harasym & Reich, Buffalo, N. Y. (Bruce A. Goldstein, Buffalo, N. Y., of counsel), for plaintiff-intervenor John Bushey.

Robert Clearfield, Buffalo, N. Y., for intervenor Buffalo Teachers Federation.

CURTIN, Chief Judge.

"We support integration as the priority education strategy; it is essential to the future of American society. In this [1967] summer's disorders we have seen the consequences of racial isolation at all levels, and of attitudes toward race, on both sides, produced by three centuries of myth, ignorance, and bias. It is indispensable that opportunities for interaction between races be expanded."

*Report of the National Commission on Civil Disorders*, at 25 (Bantam ed. 1968).

There has been much progress in race relations since this statement was written, particularly in Buffalo. However, we must remain circumspect as too many students of history, beginning with deTocqueville, have predicted that this issue would bring down The Republic.[1] No community or community leader can remain sanguine while skin color remains a political issue.

Ever since the finding of this court in 1976 that the defendants had for many years intentionally caused and maintained a segregated school system, the defendants have been under court order "to come forward with a plan that comports with the Constitution" that would remedy the segregation in the Buffalo public schools which remains from the past. From the outset, the primary responsibility for producing

such a plan has been with defendants. The court has repeatedly acknowledged that "it does not have the specialized training, the knowledge or the experience that belong to defendants." *Arthur v. Nyquist*, 415 F.Supp. 904, 969 (1976). The limited nature of the court's function has been clearly delineated by the United States Supreme Court:

> [T]he initial responsibility for devising an adequate desegregation plan belongs with the school authorities, not with the District Court. *The court's primary role is to review the adequacy of the school authorities' efforts and to substitute its own plan only if and to the extent they default.*

*Milliken v. Bradley*, 418 U.S. 717, 809, 94 S.Ct. 3112, 3158, 41 L.Ed.2d 1069 (1974) (Marshall, J., dissenting) (emphasis added).

The task before the court today, as it has been three times before in this litigation, is to review the adequacy of the Board of Education's plan, Phase IIIx.

In each of the plans put into effect since 1976, steady and impressive progress has been made in developing a final plan for remedying past segregation. The most recent plan which was put into operation, dubbed Phase III, was tentatively approved by my orders of June 19, 1980 and August 8, 1980. The court specifically conditioned its approval of the Phase III plan upon defendants continuing to meet with plaintiffs in an effort to resolve their differences. In addition, the court reserved decision on plaintiffs' motion to set a date of September 1981 by which all schools in Buffalo must be desegregated "pending consideration of the progress of the settlement discussions." Order of June 19, 1980 at 4.

Notices of appeal were filed on July 18 and August 12, 1980 by plaintiffs. This ousted the district court of jurisdiction.[2] Oral argument took place before the Court

1. *See* I *Democracy In America*, 370–79 (1862 Bowen trans.) (Vintage ed. 1945).

2. The Court of Appeals said, "Until that finding is made [that Phase III represents the maximum desegregation practically achievable] by the district court, jurisdiction is retained." The court believes there is a question as to whether

it has jurisdiction, since the matter was remanded back for only a limited purpose, pending findings. However, *all* counsel, particularly counsel for plaintiffs and defendant Board, have strenuously argued that we do have jurisdiction and have urged us to enter an order deciding what course to follow for September 1981. The parties have also consented to a

of Appeals on December 12, 1980. On January 5, 1981, the Court of Appeals remanded the case back to the district court with instructions to make specific findings of fact. *Arthur v. Nyquist*, 636 F.2d 905 (2d Cir. 1981). It also noted *in passim* that "too many years have elapsed since this litigation commenced." *Id.* at 905. From this and other observations by the Court of Appeals, it is obvious that time is of the essence in finding a final remedy.

In light of these comments, the district court *in camera* again asked the defendants

to speed up the time schedule in their Phase III proposal, in the hope that a settlement might be reached and need for further recourse to the Court of Appeals obviated. At the same time this court advised the parties that their detailed assistance would be required in drafting proposed findings of fact.[3] Vigorous negotiations ensued. There was much behind-the-scenes cooperation between parents, teachers, plaintiffs, and the Board of Education and its staff. As a result of these discussions, the Board proposed an expedited version of its earlier Phase III plan dated January 27, 1981

---

delay in our filing comprehensive findings of fact. *See generally,* n.3, *infra.* Because our decision is in the nature of findings as to the maximum integration practically achievable for September 1981, and is generally in accord with appellant's position before the Court of Appeals, we have agreed to act.

3. I orally directed the parties to commence preparation of proposed findings of fact even while negotiations continued as early as our meeting of January 13, 1981. I indicated that because of the court's calendar problems, detailed assistance from each side would be required. Moreover, I asked the defendant Board of Education to assign members of its staff to assist in the preparation of findings. I repeated these instructions in a scheduling order filed on the following day. *See* Order of January 14, 1981.

The court held another meeting with the attorneys in chambers on February 5, 1981. The attorneys argued plaintiffs' motion dated January 14, 1981 to set deadlines of March 12, 1981 for submission of proposed findings and May 21, 1981 for the "date of decision." During the argument, the court repeated its concern that the proposed findings be submitted with dispatch. In a decision dated February 17, 1981, I subsequently decided to defer ruling on that aspect of plaintiffs' motion which would have had the court set deadlines, as the plaintiffs at that point had not yet had an opportunity to analyze the latest Phase IIIx plan nor the most up-to-date data. I explicitly indicated both at the meeting and in the subsequent written order that I would again assess the differences still separating the parties at the subsequent March 5 meeting. In addition, I outlined the specific findings which would be necessary with respect to each of the questions raised by the Court of Appeals in its order. *See* Order of February 17, 1981, at n.1.

Once again, the court met with the parties on March 5, 1981. Most of this meeting took place in open court. Both during the meeting and by subsequent scheduling order, the court reiterated the need for findings in the event the

parties could not resolve their areas of disagreement. The order stated: "The court again reminds the parties, particularly the defendants, that proposed detailed findings of fact will be necessary unless this matter is resolved quickly." *See* Order of March 16, 1981, at page 2.

My reasoning for requiring the assistance of counsel was based on several grounds. First, in any case of this length and complexity the court must be aided in reviewing the massive record. I note that the court files in this ten-year-old lawsuit have consumed nine file cabinets in my courtroom and chambers.

Second, the general calendar congestion of this court has continued to worsen in the past year. For example, in March 1981, a not atypical month, there were 110 criminal and 1,400 civil cases on the Western District of New York docket. This is roughly 35 criminal cases and 470 civil cases per judge. In addition, a major securities acquisition case came on my calendar in January and has already acquired considerable judge time. *Buffalo Forge v. Ampco-Pittsburgh*, Civ. 81–29. *See* Orders of January 9, 12, 15, 26; February 17, 23, March 5, 1981. *See also, Buffalo Forge v. Ampco-Pittsburgh, supra,* 638 F.2d 568 (2d Cir. 1981). I have also had need to devote increasing attention to important questions which have arisen in the so-called Love Canal litigation. *United States v. Hooker Chemicals and Plastics,* Civ.Nos. 79–987, 79–988, 79–989, and 79–990.

Finally, during the fall of 1980 and winter of 1981, Judge Harold P. Burke was engaged in a lengthy criminal trial which prevented him from attending to the many other matters on the Rochester docket. Subsequently, Judge Burke took ill in February and has not been able to pursue his judicial duties since then. He has elected to take senior status effective June 15, 1981. Although Judge John T. Elfvin and I have divided supervising Judge Burke's Rochester cases, it is clear that two judges cannot give as much attention to the district's caseload.

("Phase IIIx"). It was approved by a majority of the Board on February 4, 1981. If ordered into place, this plan would impose fixed assignments effective September 1981.[4]

Plaintiffs subsequently were given an opportunity to critique the plan in writing; a response was filed on March 5, 1981.[5] In the interim, the Board passed a resolution (1) directing that the court be informed of the decreasing likelihood of its being able to implement the Phase IIIx proposal and (2) requesting a year's delay in its implementation "in order to get the plan set."[6] *See* "Excerpt From Board Meeting of 2/18/81," Exhibit 673 at 1 and 5.

As a result of the negotiations, the parties prepared a number of orders for the court's signature. On March 27, 1981, the court issued an order setting forth the three alternative school desegregation plans which had been proposed by the parties.

The court directed that there be a public hearing on the three alternative proposals. The hearing took place on April 7, 1981 and lasted an entire day. The defendants presented testimony as to why implementation of the Phase IIIx plan should be delayed until September 1982. There was also much discussion of Schools 43 and 78. Mr. Eugene Reville, the Superintendent of Schools, explained that the Board would be in a better position to implement the plan in 1982. He stated that the Board would be able to demonstrate to the community the success of its Early Childhood Center and academy programs, thereby convincing parents to send their children voluntarily to the affected schools. He argued that this would be consistent with the court's directives to date. However, both he and Mr. Joseph Murray, the Associate Superintendent of Schools, conceded under cross-examination that the Board of Education would

---

4. The IIIx proposal states:

> We feel that we cannot complete the Buffalo Public School desegregation program until the end of the 1982–83 school year.
>
> · If the Court orders fixed assignments for September, 1981, all schools involved in the Early Childhood Clusters will be balanced in all grades....

*See Buffalo Public Schools, Phase IIIx*, Exhibit 627 at p. 49.

5. *Plaintiffs' response to Board of Education* submission of February 5, 1981 entitled "Buffalo Public Schools Phase IIIx January 27, 1981 Revised," at pp. 24–25:

> Plaintiffs find the Board's "Phase IIIx Revised" Proposal of January 27, 1981, acceptable with the following provisions:
>
> 1. Desegregation of all elementary and high schools within Court-ordered guidelines shall be implemented by September 1981; and,
>
> 2. The ECC [Early Childhood Center] clusters as proposed (pp. 41, 67–69) are acceptable if:
>
> a. The Board retains PK as an integral part of the program or adds third grade, and
>
> b. ECC volunteers from non-clustered schools shall be placed at ECCs # 53 and # 74, providing such transfers contribute to desegregation, and
>
> c. Closed # 23 students are allowed to attend a desegregated school in the neighborhood for part of their elementary years; and
>
> 3. All freedom-of-choice programs shall be given appropriate cut-off dates (April 1, 1981 for ECCs # 53 and # 74; May 31, 1981 for magnets # 37, # 39 and # 59) and back-

up student assignment plans, if necessary; and

> 4. The Board shall develop and implement policy and procedures on student transfers and acceptances to the optional magnet, ECC, and vocational schools to enhance and preserve desegregation in sending and receiving schools, as defined above; and
>
> 5. QIE shall be eliminated, but a majority-to-minority program, as defined above, is permissible once a comprehensive student assignment plan is in place; and
>
> 6. The Board shall develop and submit a comprehensive report on its proposed educational support programs, as defined above, by June 1, 1981.

6. As was stated by Superintendent Eugene Reville, in his testimony on April 7, 1981, the court notes that this second resolution by no means rescinds the Board's Phase IIIx proposal. However, it is clear that a majority of the defendant Board prefers to delay implementation of Phase IIIx until September 1982.

At the hearing, Mr. Reville testified approximately as follows:

> It was my understanding that the Board of Education voted for [implementation of the Phase IIIx Plan for] both ... September of this year and September of next year, but showed a preference for September of '82. And it's clearly stated on the record that this was not any opposition to the plan that was devised by the staff. It was because ... a desire to be certain that the plan was successful. In order to be successful, there needed to be more time.

be able to implement the Phase IIIx plan as originally proposed for September 1981, if ordered to do so.

By decision filed April 16, 1981, the court rejected the plan which would have in effect exempted Schools 43 and 78 from the overall systemwide fixed assignment plan. This had the effect of eliminating one of the three orders. It did not put any order in place.

All of the parties have now come to the court asking that we decide whether to order implementation of the Phase IIIx plan for September 1981 as originally proposed, or to grant another year's delay, as the Board now requests.

If either of these plans is to work, speedy action is required. The court has learned over the course of the many years of this litigation that successful integration of the schools requires careful planning by the Board's staff. It is important that as much advance notice as possible be given so that logistical and technical problems may be anticipated, and thereby avoided. The Board must have opportunity to meet with students and parents now, before the summer, so that an orderly transition to Phase IIIx can be accomplished, if the plan is ordered for September 1981. In my judgment, it is therefore essential that all legal hurdles be alleviated and a decision rendered now on this key issue. Every day counts.

### LAW

The direction of the United States Supreme Court and of the United States Court of Appeals for the Second Circuit in school desegregation cases is clear. Once there has been a finding of intentional segregation of the public schools, the district court must direct the "maximum desegregation practically achievable." *Arthur v. Nyquist*, 636 F.2d 905, 907 (2d Cir. 1981). The Supreme Court, per Brennan, J., has said:

The burden on a school board is to come forward with a plan that promises realistically to work, and promises realistically to work *now*.

*Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) (emphasis in original). In this very case, the Court of Appeals has said that the timing of the remedy in such cases is "of the utmost constitutional importance." *Arthur v. Nyquist*, 636 F.2d *supra* at 906. If the scope of the intentional segregation which occurred was systemwide, then the remedy must match the violation and also must be systemwide. *Columbus Board of Education v. Pennick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Reed v. Rhodes*, 607 F.2d 714 (1979), cert. denied 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). The district court must evaluate the School Board's plan to determine whether it has "real prospects for dismantling the state-imposed dual [school] system 'at the earliest practicable date ....' " *Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1967). There comes a time, however, when so-called freedom of choice plans will not be sufficient.

Where [a freedom of choice plan] offers real promise of aiding a desegregation program to effectuate conversion of a state-imposed dual system to a unitary, nonracial system there might be no objection to allowing such a device to prove itself in operation. *On the other hand, if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, "freedom of choice" must be held unacceptable.*

*Green v. County School Board, supra* at 440–41, 88 S.Ct. at 1695–96 (emphasis added).

In short, *the heavy burden on the School Board in the instant proceeding is to demonstrate why the very plan it proposed, in response to the court's order, should not be placed into effect as originally proposed.* At the same time, it must be observed that the constitutional command to desegregate schools does not mean that every school in

every community must always reflect the racial composition of the school system as a whole. *Swann v. Board of Education*, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1970).

## ANALYSIS

Plaintiffs have pointed out a number of areas where the plan could be made more efficient in integrating the schools. They maintain that there is a disproportionate burden placed on minority children and that particular minority communities are completely without local schools. They argue that in a school system with approximately equal numbers of majority group and minority group youngsters, there should be no all-minority or almost all-minority schools. They remind the court that a number of schools, variously put between four and eight, would remain disproportionately minority even under the Phase IIIx plan. They argue that provision should be made in the event that pre-Kindergarten classes are discontinued. Not without reason, they argue that it is unjust to insist that minority children be forced to carry the weight of a remedy brought on by unconstitutional actions taken by the School Board against other minority children. As is made clear by their papers filed with the Court of Appeals and with this court, the plaintiffs would, given their way, have the court go considerably beyond Phase IIIx.

The Board is similarly dissatisfied. The Phase IIIx plan with its implementation date of September 1981 was issued in direct response to court order. The subsequent resolution makes clear, if there were any doubt, that this was not the Board's preferred course of action. It remains plain that, left to its own devices, the Board would not have employed any compulsory integration techniques. In fact, the school district's considerable success with voluntary integration techniques has been itself held up as reason enough to foreclose any mandatory pairing, clustering, or the like.

The court, early on in these proceedings, warned the Board that if it did not comply and commence the preparation of a deseg-regation plan, one might have to be implemented, not of its own making. *See* Order of April 30, 1976 at 153. Fortunately, the Buffalo Board's statesmanlike cooperation throughout the course of this litigation removed the need for the court to resort to other means of implementing its desegregation orders. It is with this background that the Board approved Phase IIIx.

The compromises by both sides have been considerable. By conceding its ability to implement Phase IIIx in September 1981, the Board has taken a long step toward accommodating plaintiffs' position. By plaintiffs giving their support to the Phase IIIx plan's implementation in September 1981, they have also abandoned important principles in the name of peaceful resolution of this dispute. The parties on all sides have given the court reason to believe that a comprehensive settlement might be achievable if an order would issue now. This would make time-consuming fact-finding unnecessary. It would also speed a final settlement of this long, difficult lawsuit. This would mean that the amicable resolution of the major issues in this lawsuit, which this court has so long endeavored to obtain, would be at hand. In addition, the primary complaint of plaintiffs in their appeal was the court's failure to make firm the Board's proposed date of September 1981 as the date of implementation of the fixed assignment plan. This was an important factor in the Court of Appeal's very decision remanding the case back to this court. Deciding the timing issue now would speed matters to their conclusion consistent with the spirit of that order.

Another advantage of such a settlement would be that parents and students would be better able to know where their children will attend school in future years. This would allow them to make their plans accordingly and would eliminate the burden of uncertainty. It would also allow the Board and its staff to better plan how to allocate scarce resources. Most importantly, the upsetting nature of this controversy would be at an end with imposition of a fixed plan.

## DECISION

The court is convinced that the advantages to implementing Phase IIIx for September 1981 exceed the reasons for further delay. Primarily, the court is satisfied that this plan will maintain quality education by further progressive educational innovation, while at the same time furthering the goal of equal educational opportunity. The School Board has shown that the Early Childhood Center and magnet programs can provide students with an excellent education. The pedagogical creativity and academic achievement displayed by these programs has merited the participating schools a high regard in the community and has generated some fairly long waiting lists for admission to them. The proposed academies, which are the new 3–8 grade schools, are designed to be an important supplement to this existing, largely successful educational structure. It is worth observing that on these points, there is no dispute whatsoever among the parties in this suit.

The court's careful examination of the integration process to date leads inescapably to the following conclusion. The Board seems to have achieved the maximum success possible by use of voluntary measures such as magnets. In the 1980–81 school year, both the Martin Luther King and Futures Academy magnet schools were significantly outside the court's parameters for a desegregated school (30%–65% minority). This was despite these schools' having acknowledgedly strong educational programs, proven track records, and the Board having undertaken special recruiting efforts. The law requires that if the court concludes there are reasonably available ways of integrating the school system which promise to be speedier and more effective than freedom-of-choice measures, then it must impose them. The Board has offered no persuasive reasons why it believes that it would be more successful in this endeavor next year.

There is no guarantee that there would be any significant difference in the circumstances in which the Board would find itself then. It is true that the Board would have had another year to demonstrate the success if its Early Childhood Center and magnet approach. However, the success of the program is evident. The community has had substantial familiarity with these programs for over two years. The Phase IIIx plan has been well circulated and discussed in the press. Indeed, many parents active in their school communities participated in its preparation through the numerous Board-sponsored community meetings. They cannot be heard to say now that the plan is a surprise, or that they doubt its educational strength. In short, the court is satisfied that the plan can work *now*. This is particularly important because this lawsuit has been pending since June 1972 and has been in the remedy phase since April 1976.

It has of late been argued by some that the Board's current financial troubles require a year's delay. The court record is barren of any formal evidence of this objection. More importantly, it is certainly not a problem likely to be resolved by next year. On the contrary, it is the court's experience that disputes among the Common Council, the Mayor, and the Board are part of the democratic fabric of our community. For the purposes of this lawsuit, the court must assume that the defendant Council will do its duty and provide adequately for the Board's integration efforts. As the court noted in its original liability decision,

> This court cannot allow the Common Council and the Board to avoid liability by pointing the finger at each other.

*Arthur v. Nyquist*, 415 F.Supp., *supra* at 969.

On the other hand, the Board would have an extremely difficult task proving to a preponderance of the evidence that because of budget reductions imposed on it, *no* integration plan could be entered. I note, in this regard, that by the Board's own estimates, only 3,000 additional students will be added to the 25,000 who are currently, largely voluntarily, being transported. This is hardly a massive number. It is also worth observing that if inflation continues to rise and the size of our student communi-

ty continues to decline, then implementing the plan as soon as possible would certainly be the wiser course.

The court also believes that community acceptance, upon which any plan necessarily depends, will be forthcoming this year as likely as next. There is no doubt that the Phase IIIx plan, no matter when implemented, will be unpopular in some quarters. However, the community has participated at every phase of this lawsuit. In the period immediately after the liability decision in 1976, a number of court-sponsored public hearings were held throughout the City. The same process was repeated on a more limited basis under the auspices of the Board before both the Phase II and Phase III plans were submitted. Throughout the course of this litigation, Mr. Robert White, Deputy Clerk of the Court, has made available all communications which have been sent to the court to the parties. *See* Order of May 19, 1976. As noted earlier, on April 6, 1981, the court itself held a public hearing at which time community comments were solicited. Although the testimony taken concerned Phase IIIx as a whole, the public comments received almost exclusively concerned Schools 43 and 78. The more generalized comments received were in the nature of unspecified opposition to all integration efforts. In view of the finding of intentional segregation, the court clearly cannot respond to such observations in any fashion. Also important, the total number of comments was small, both in absolute terms and especially when compared with the number of children in the school system. This reflects the fact that the School Board and the court have made every effort to acquaint the affected schools and parents with their role in the proposed plan.

Finally, this is not a matter of discretion for the court. Under law, the court *must* order implementation of any plan which assures the "maximum desegregation practically achievable." In this case, the Board has admitted that it can implement the Phase IIIx plan, which it itself proposed, in September 1981. Consequently, as to the simple expedient of choosing between the two remaining proposed orders, the court's choice is compelled by the parties themselves. Both the Board and the plaintiffs agree that the Board can implement the very plan it produced, using the timetable it suggested. Once the court ascertains that the Board can physically implement the plan by September 1981, as both parties agree it can, the court has no choice but to direct implementation for that date.

## CONCLUSION

The issuance of this decision reflects the beginning of the end of this school desegregation case. It is not, however, a final order in the sense that there will be no more. *Cf.*, 28 U.S.C. § 1291. The court anticipates that some problems will arise in the implementation of the Phase IIIx plan in September and that the court may have to become involved in resolving them. There will also be need to review the success of Phase IIIx. In addition, a number of other issues remain, including: the monitor proposal, attorneys' fees, appointment of probationary teachers, preserving a balance at Kensington High School, and the treatment of Hispanic and handicapped students. Most importantly, there is the question of the status of the schools which will remain outside the court's parameters for being deemed desegregated, even if the Board's own projections are correct as to the school enrollments under Phase IIIx in September 1981. The court anticipates that most of these problems can either be resolved by the parties themselves or by the court on papers presented by both sides *before* the end of the summer. The question of the success of Phase IIIx will be reviewed by the court in November 1981. If these issues are satisfactorily resolved during the summer and if implementation of Phase IIIx goes according to the plan at this time, the court can anticipate issuing a truly "final order" in January 1982.

## ORDER

The court, having received the Board's submission styled Phase IIIx and plaintiffs' response dated March 5, 1981, and all par-

ties having had an opportunity to comment on all aspects of Phase IIIx, and the court having determined that, in part, Phase IIIx advances the objects of this action in desegregating the Buffalo Public School system at the earliest practicable date, it is therefore

ORDERED, that the Board implement fixed assignments as to the schools indicated in the clusters appearing on page 49 of the Board of Education's Phase IIIx plan (Exhibit 613), with clustered schools to house either grades pre-Kindergarten–2 or 3–8, and the addition of School 51 to the 23/42/52 cluster (pp. 67–69, Exhibit 613), said assignments to be implemented for the school year commencing September 1981, provided that voluntary applicants from school districts within the Early Childhood Center clusters shall be placed in their district cluster school; and it is further

ORDERED, that Early Childhood Center programs be established at Schools 53 and 74 to which applicants from school districts not associated with other Early Childhood Center clusters may be assigned, provided that such assignments contribute to desegregation of Schools 53 and 74 and do not contribute to segregation of schools in the district in which applicants reside; and it is further

ORDERED, that the parties shall meet and discuss all remaining issues in this case including, but not limited to, the monitor proposal, attorneys' fees, Kensington High School, Hispanic intervenors, and handicapped intervenors and report to the court in writing no later than June 30, 1981 as to their respective positions; and it is further

ORDERED, that the Board shall provide a detailed written report on the operation of Phase IIIx, including any major operating problems which arise, on or before November 1, 1981. Plaintiffs shall reply to the report within three weeks of their receiving it. The court will convene a meeting soon thereafter so that a final order or findings of fact may be issued in January 1982.

So ordered.