**George ARTHUR, et al., Plaintiffs,**

v.

**Ewald P. NYQUIST, et al., Defendants.**

**No. Civ–1972–325.**

United States District Court, W.D. New York.

May 23, 1983.

---

Jay, Klaif & Morrison, Buffalo, N.Y. (David G. Jay, Buffalo, N.Y., of counsel), for plaintiffs.

Joseph P. McNamara, Corp. Counsel, Buffalo, N.Y. (William E. Carey, and Aubrey McCutcheon, Buffalo, N.Y., Special Counsel for the Buffalo Bd. of Educ., of counsel), and Raichle, Banning, Weiss & Halpern, Buffalo, N.Y. (Frank G. Raichle, and Arnold Weiss, Buffalo, N.Y., Special Counsel for Mayor James D. Griffin and the Common Council of the City of Buffalo, of counsel), for defendants Mayor James D. Griffin, Superintendent of Schools Eugene T. Reville, The Bd. of Educ., and the Common Council of the City of Buffalo.

Jaeckle, Fleischmann & Mugel, Buffalo, N.Y. (J. Edmund deCastro, Jr., Buffalo, N.Y., of counsel), for plaintiff-intervenor Community Advisory Bd. for Bilingual Educ. of Buffalo.

Bruce Fenwick, Buffalo, N.Y., for intervenor Buffalo Teachers Federation.

CURTIN, Chief Judge.

Before the court is plaintiffs' motion to require defendant Board of Education [the Board] to devise a new plan to increase the number of majority students at three remaining racially identifiable elementary schools in the Buffalo Public School System. The Board has responded that it has now achieved the maximum level of systemwide desegregation practicably possible and is unable to devise any new plans which would feasibly increase the number of majority students attending these schools at this time. Upon close scrutiny and a review of the record, and in consideration of the alternatives presented by the parties, the court concludes that the Board has in fact achieved this maximum level of systemwide desegregation practicably possible and that under these conditions, the racially identifi-

able status of these schools does not offend the Constitution.

This determination does not mean that the defendants' important work of continuing the desegregation process and improving the quality of education in the Buffalo Public Schools is completed. Nor does it mean that the final chapter in all aspects of this case has been written. Yet, it does mark an important point on the path to achieving a fully integrated and unitary school system, and a system in which all the citizens of Buffalo may take pride.

Some nine years ago, this court found that the Buffalo Board of Education had operated a *de jure* racially segregated school system. *Arthur v. Nyquist,* 415 F.Supp. 904 (W.D.N.Y.1976). Since that time, the Board has operated under an "affirmative duty to take whatever steps might be necessary" to eliminate all vestiges of past school segregation. *Green v. County School Board,* 391 U.S. 430, 437, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716. The clear mandate as expressed by the United States Supreme Court has been to eliminate racial discrimination "root and branch," *supra* at 438, 88 S.Ct. at 1694, and to create a system "without a 'white' school and a 'Negro' school, but just schools." *Supra* at 442, 88 S.Ct. at 1696.

During this time, the court's primary role has been to review the school authorities' efforts at achieving this goal. The duty of the court is to safeguard the fourteenth amendment's guarantee of equal protection under the laws and to act as an arbiter of a legal dispute rather than a super school board. This position was first expressed in the court's liability finding, *Arthur v. Nyquist,* 415 F.Supp. at 910, and has been repeated many times since then. Only if and to the extent that the school authorities defaulted in their efforts would the court substitute its own plan. *Milliken v. Bradley,* 418 U.S. 717, 809, 94 S.Ct. 3112, 3158, 41 L.Ed.2d 1069 (1974) (Marshall, J., dissenting); *Arthur v. Nyquist,* 415 F.Supp. at 969.

In concluding that the Board has achieved the maximum desegregation practicable, it is necessary to review the steps which have been taken in dismantling the dual system and to scrutinize the status of these schools.

Prior to the initiation of Phases I, II and IIIx, the Buffalo Public Schools had a minority student population of 45.8 percent and were severely racially imbalanced—55 of 77 elementary schools, 5 of 6 junior high schools, and 7 of 13 high schools had racial compositions of 80–100 percent majority or minority students. *See Arthur v. Nyquist,* 415 F.Supp. at 915–20.

In Phase I, ten schools were closed, attendance zones were changed, and two magnet schools, the Waterfront School and the City Honors School, were established. As an integral part of the overall plan, community participation in the desegregation process has been encouraged. During Phase I, local attorneys, accompanied by School Board representatives and staff, explained the impact of the court's desegregation order to parents at community meetings and solicited parents' involvement and suggestions for changing and improving the school system.

During Phase II, four more school buildings were closed, formerly segregated schools were paired and clustered,[1] and through the Quality Integrated Education Program [Q.I.E.], each predominantly majority school was initially integrated with at least 20 percent minority students. New feeder patterns were created so that elementary school children would attend racially balanced schools and, in subsequent years, racially balanced high schools. Under this phase, five new magnet schools for Grades pre-Kindergarten through 8 were created,[2] along with the Montessori School

---

**1.** A "cluster" is a grouping of schools in which the students living in one school's district are zoned to attend another school for certain grades. *See Arthur v. Nyquist* order of June 19, 1980, n. 1.

**2.** These schools include the Academic Challenge Center, Build Academy, Campus East, Campus West, and the Follow Through School. Each of these schools is distinctive. The Build Academy is an example of a community-based

(Grades pre-Kindergarten through 6), the Performing Arts Academy and the Buffalo Traditional School (Grades 5 through 12), the Buffalo Alternative School (Grades 9 through 12), and the Vocational Technical Center (Grades 11 through 12), all as magnet schools. Two regional magnets,[3] the Native American Magnet School (Grades pre-Kindergarten through 8) and the Spanish-English Magnet School (Grades 1 through 4) were also established.[4]

Additionally, the court established racial composition guidelines for the elementary schools within the system. The goal of this plan was for each school to reflect the racial composition of the district as a whole, and the enrollment figures in 1979 indicated that the Buffalo Public School System was comprised of approximately 50 percent majority and 50 percent minority students. *Arthur v. Nyquist,* 473 F.Supp. 830, 848 (W.D.N.Y.1979). The parties and the court recognized that a mathematically perfect balance would be difficult to achieve in every elementary school within the system. Accordingly, racial composition guidelines of 25 to 65 percent minority students attending each elementary school were established, and a school would be considered integrated if minority enrollment was within these guidelines. *Id.* These guidelines were later changed to 30–65 percent minority students attending each elementary school in the court's order of June 19, 1980, and magnet schools were required to contain a student population equal to 50 percent majority and 50 percent minority.

When these guidelines were established, the court stated:

> Any deviations from this guideline will be allowed only after a specific and detailed showing on a school-by-school basis that practicalities such as distance and difficulties of travel or physical barriers preclude further desegregation.... It may be that it will be impossible to rid the system of every [racially identified minority] school, but an attempt must be made and, if this objective cannot be reached, good reason must be set forth in the record.

*Arthur v. Nyquist,* 473 F.Supp. at 848.

Phase II did not always proceed without difficulties. The complexity and problems with Q.I.E. were well documented, *see Arthur v. Nyquist,* 473 F.Supp. at 837–42. At its zenith, this particular program involved the transportation of 3,000 minority students who were sent to receiving schools across the City, and it became apparent that the burden placed on minority children was neither desirable nor permissible. Further, the complexity of the program had reached the point where it became virtually impossible to administer.

Additionally, Phase II was not a system-wide remedy, as required under the standards announced in *Dayton v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). Under Phase II, 15 all-minority elementary schools remained segregated, with no showing by the Board that it would be

school which involves community participation in the educational decision making process. The Follow-Through School emphasizes a classroom environment where each student moves at his or her own pace through selected learning activities, while Campus East is designed for students who learn best in a structural environment. The Academic Challenge Center tests all students at the beginning of the school year in reading and mathematics, and based upon the test results, a personalized educational program is developed for each student. Both the Follow-Through School and the Academic Challenge Center guarantee admission to the children who live within the geographical districts of these schools. Campus West is a demonstration school located on the campus of the State University College at Buffalo and is

jointly operated by the School Board and the College.

3. A "regional magnet" school permits students residing within the school's attendance zone to attend the magnet school. It is designed to help integrated schools remain so by encouraging the racially balanced student neighborhood population to attend these schools. On a space-available basis, children from other areas of the City are eligible to apply to these schools.

4. The Native American School teaches Mohawk and Seneca languages to its students, and the Spanish-English School focuses on developing competent bilingual students at an early age.

impractical to desegregate them. As a result, the court directed the Board to

> draft a new remedy plan which to the greatest extent practicable will desegregate the all-minority schools. . . . If the Board's position is that further steps to integrate the all-minority schools ought not to be taken, the burden is on the Board to show why these steps cannot be taken and it must compile evidence showing clearly the physical or other barriers which it claims prevent further integration.

*Arthur v. Nyquist,* 473 F.Supp. at 837.

This in turn led to the formulation and implementation of Phase III and its expedited version, Phase IIIx. *See Arthur v. Nyquist,* 636 F.2d 905 (2d Cir.1981); 514 F.Supp. 1133 (W.D.N.Y.1981). Under this phase, nine additional elementary schools were closed, three new magnet schools and two additional regional magnet school programs were established,[5] students were rezoned, and new clusters of schools and feeder patterns were devised. A smaller, manageable version of the Q.I.E. program was allowed to continue to assist in meeting the racial balance guidelines. Upon assurances that the restructured program would truly be voluntary, it permits minority parents to transfer their elementary school children to schools in peripheral areas of Buffalo and now involves the transportation of 700 students.

One of the most important aspects of this phase was the establishment of ten Early Childhood Centers (Grades pre-Kindergarten through 2) and 16 Academies (Grades 3 through 8). Under this model, students from a racially identified minority school were paired with children attending a majority school. Young children from both schools attend an Early Childhood Center located in the minority neighborhood, and older students from both schools attend an Academy located in the majority neighborhood. The programs in the Early Childhood Centers and Academies are designed to complement each other and to provide a high quality education.

The implementation of the Early Childhood Center/Academy plan was generally accomplished through fixed assignments and cross-busing between the paired and clustered schools. An Early Childhood Center and an Academy were also established at both Schools 53 and 74. These two schools were not paired, and admission to the programs offered at these schools is made available to neighborhood minority students and to majority students throughout the City on a voluntary basis.

This plan was implemented in September of 1981 and has proven to be remarkably successful. "There has been no disruption of the schools, no violence, and no massive 'white flight' of majority students from the City." *Arthur v. Nyquist,* 547 F.Supp. 468, 470 (W.D.N.Y.1982).

The primary method for achieving desegregation in the school system has been through voluntary means, and these achievements have been directly attributable to the hard work and concerted efforts of the School Board and staff, parents, teachers, students, and all the parties involved in this case. The School Board's cooperation with the court became immediately apparent when the court issued its liability finding in April, 1976, and the

---

**5.** The three magnet schools established under this phase were the Futures Academy, the Dr. Martin Luther King, Jr. Multi-Cultural Institute, and the Herman Badillio Community School, for students attending Grades pre-Kindergarten through 8. The Futures Academy teaches basic subjects during the morning, and afternoon sessions are devoted to a life skills curriculum which provides students with a foundation for careers in later life. The Dr. Martin Luther King, Jr. School stresses student exposure to African, European, and Latin cultures, and each child who enters this school

begins a language program in French, Spanish, or Italian. Both the Futures Academy and the Institute guarantee admission to the children who live in the geographic district of these schools. The Herman Badillio Community School was named by the neighborhood residents and offers a bilingual-bicultural Spanish-English education.

The regional magnets created were the gifted and talented components of the Frederick Law Olmstead school and Campus North, which functions as a traditional school emphasizing a highly structured learning environment.

Board had a plan ready to begin the integration process. Since that time, the court has consistently received excellent cooperation from the Board and school staff in implementing the court's orders. The desegregation plans have been far from perfect, but the willingness of the parties to work together and with the court in resolving the many daily problems which arose during the implementation of the various phases was critical to the success of these plans.

Another important factor has been the role of the Citizens for Quality Education and the Citizens Commission on School Desegregation in informing and involving parents, students, and community organizations in the desegregation process. Their efforts cannot be overstated, and the resulting participation and confidence of the citizens of Buffalo in their school system has grown rapidly since 1976. Unlike other cities faced with court-ordered desegregation plans, both majority and minority parents have demonstrated a concern to remain and build a quality integrated public school system. It is significant that a number of suburban students are now on waiting lists to attend City public schools.

As a result, there are but three elementary schools which remain outside the court's guidelines and are racially identifiable: Schools 53, 59, and 74.[6] In the spring of 1982, plaintiffs moved to further desegre-

gate these schools and submitted a plan to cluster each of these schools with other elementary schools to achieve a racial balance.[7] The issue was explored in depth as part of the hearing held on the City's funding of the public schools, *see Arthur v. Nyquist,* 547 F.Supp. at 483–84. The Board contended that plaintiffs' plan would cause schools which are now racially balanced to be thrown outside the court's guidelines. Additionally, intervenors representing a class of handicapped children attending the public schools objected to the proposed plan. They argued that adoption of the plan would inhibit compliance with a consent decree entered in *Andres v. Reville,* Civ. 80–482, a case which involves the education of trainable mentally retarded children attending School 45. The court concluded that the "record shows that the plan would be financially burdensome, disruptive, and, most importantly, it would not significantly benefit the desegregation effort." *Arthur v. Nyquist,* 547 F.Supp. at 484.

Plaintiffs have not proposed any alternatives to their plan rejected last summer but have now moved the court to order the defendants to submit a plan to further integrate these three schools.

In *Swann v. Board of Education,* 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1970), the Court explained that

**6.** The court notes that the only other elementary school within the Buffalo Public School system which might possibly be considered racially identifiable is the Dr. Martin Luther King, Jr. Multi-Cultural Institute. The most recent BEDS [Basic Educational Data System] statistics for 1982–83 show that the Institute, a magnet school for Grades pre-Kindergarten through 8, is attended by 70.8 percent minority students, 28.8 percent majority students, and .3 percent Hispanic students. In 1981, the Community Advisory Board for the Institute requested that the racial balance guidelines allow for the admission of non-American Black minorities to enhance the unique multi-cultural aspects of the program. Under a plan to which plaintiffs have concurred, the Institute guidelines are: 25 percent majority students, 65 percent resident minority students, and 10 percent majority or minority students who are non-American Blacks (Plaintiffs' Report to the Court, August 28, 1981, p. 4). The ethnic com-

position of the Institute is not challenged by any of the parties nor considered by the court at this time.

**7.** Plaintiffs proposed to cluster School 53 with Schools 19 and 45 and create an Early Childhood Center at School 53 and Academies at Schools 19 and 45. As previously noted, School 19 serves as the Native American Regional Magnet School, and School 45 is a learning center for over 200 handicapped students. Plaintiffs also proposed to cluster School 74 as an Early Childhood and create Academies at Schools 64 and 81. This plan would have brought all three schools dangerously close to being racially imbalanced. Plaintiffs further proposed to create an Early Childhood Center at School 40 and create Academies at Schools 59 and 71. Under this proposal, the science magnet school, School 59, would have been eliminated. *See* discussion, *infra.*

the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law. The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools. The Court in *Swann* further explained that the existence of one-race schools in a school system with a history of segregation creates a presumption against their continued existence. The School Board has the burden of showing that these school assignments are genuinely nondiscriminatory. Further, the School Board must satisfy the court that the racial composition of the schools is not the result of present or past discriminatory action on their part, and these schools will be tolerated only after close scrutiny by the courts. *Id.* Thus, a constitutional plan may leave some racially identifiable schools, provided that further desegregation is not feasible. The School Board must undertake the "greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Davis v. Board of School Commissioners of Mobile County,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).

Whether a school system can feasibly undertake further desegregation is a unique question to each school district. Plaintiffs suggest that an analogous situation exists in the Baton Rouge, Louisiana, school system, and that the court should follow the court rulings in that long and troubled desegregation case. *See United States v. Jefferson County Board of Education,* 380 F.2d 385 (5th Cir.1967), *sub nom. Davis v. East Baton Rouge Parish School Board,* 570 F.2d 1260 (5th Cir.1978), 498 F.Supp. 580 (M.D.

La.1980), 514 F.Supp. 869 (M.D.La.1981), 533 F.Supp. 1161 (M.D.La.1982), and 541 F.Supp. 1048 (M.D.La.1982). Plaintiffs also suggest that cases involving the Tuscaloosa, Florida, and Nashville, Tennessee, school systems are appropriate models demonstrating the need for further efforts in school desegregation. In *Lee v. Macon County Board of Education,* 616 F.2d 805 (5th Cir. 1980), the court found a desegregation plan unacceptable, since it left two-thirds of Tuscaloosa's elementary-grade black students attending schools more than 95 percent black. In *Kelley v. Metropolitan County Board of Education,* 687 F.2d 814 (5th Cir. 1982), the United States Court of Appeals for the Fifth Circuit affirmed a district court's refusal to accept the Nashville School Board's desegregation plan, which maintained ten schools attended by 86–100 percent minority students in a school district which contained 68 percent majority and 32 percent minority students. *Id.* at 818 and n. 8.

Yet, in the recent case of *Ross v. Houston Independent School District,* 699 F.2d 218 (5th Cir.1983), the court affirmed a district court's finding of a unitary school system, although some 57 one-race schools remained within the school district. The court concluded that the school district had "done everything practicable at an intradistrict level to eradicate the effects of past segregative practices." *Id.* at 227.[8]

■ Thus, an evaluation of a school board's desegregation efforts must be based on the facts of each case, and in this respect, each school district is unique. The constitutional mandate against racial discrimination is unequivocal, but the remedy plan must be flexible, sensitive, and effective. It must take into account the "practicalities of the situation." Similarly, the

---

**8.** *See also Clark v. Board of Education of the Little Rock School District,* 705 F.2d 265 (8th Cir.1983). In that case, the United States Court of Appeals for the Eighth Circuit affirmed a district court order approving a desegregation plan, whereby four virtually all-Black schools would be created "with the result that approximately 19 percent of all nonwhite students would be attending racially identified schools." At 272. The Appeals court noted that minority students attending racially identified schools had the option of transferring to integrated schools. The court further emphasized the important continuing commitment of the School Board to ensure an equal educational opportunity to all students within the school system.

determination of whether the school board has satisfied its responsibility to eradicate segregation must be based on conditions in the district, the accomplishments to date, and the feasibility of further desegregation measures. *Ross v. Houston Independent School District*, 699 F.2d at 227.

At the request of the parties, the court visited each of the three schools involved here.[9] According to the most recent data collected by the Board of Education,[10] these schools are attended by 7 percent of the minority public school students in Buffalo and together comprise 3.4 percent of the total students presently enrolled in the school system. School 53 has some 866 students who attend classes ranging from pre-Kindergarten through Grade 8. The school has a minority population of 90 percent, and the bulk of the majority students who attend this school attend the Early Childhood Center. Similarly, School 74 has 511 pupils, of which 86.4 percent are minority students. Again, the majority students attending this school are found in the Early Childhood Center program. Both these schools have a long history of academic excellence and achievement, and both schools are physically attractive. The classrooms, buildings, and grounds are well kept.

Unfortunately, the same cannot be said for School 59, which has a peculiar history. As part of the desegregation process, the original School 59, located on Glenwood Avenue, was closed in 1976. At that time, the Board planned to build a new school building, but in the interim, students were temporarily placed at School 24, located at Fillmore and Best Streets. This school building had also been closed as part of the desegregation process but was reopened and renamed in order to accommodate School 59 students during this interim period.

The Board then designated School 59 to be both an Early Childhood Center and a magnet school,[11] with a specific emphasis in science. Under this plan, the school has developed an intensive and innovative science curriculum and has three campuses: Grades pre-Kindergarten through 4, and several classes of students in Grades 5 and 6 are located at the School 59/24 site; several other classes of Grades 5 and 6 are taught at the Buffalo Museum of Science and utilize the facilities of this institution. Grades 7 and 8 are temporarily located at School 60, and a school building for these students is presently being constructed on the grounds of the Buffalo Zoological Gardens.

The Board proposes to build a new School 59 near its original Glenwood Avenue site, and this facility will be an Early Childhood Center and contain students in Grades pre-Kindergarten through 4; students in Grades 5 and 6 will attend classes at the Museum of Science, and students in Grades 7 and 8 will use the new school building located at the zoo.

There are presently 570 students attending School 59 at its three campuses, which are located within a fairly close geographical area. Grades pre-Kindergarten through 4 are comprised totally of minority students, and the data submitted by the Board for the entire school shows a minority student population of 84.9 percent.

Both plaintiffs and the Board agree that the aging School 59 building located at the School 24 site is unacceptable. The building lacks a gym, insufficient luncheon facilities, classroom space, and library capacity. During my visit to the site, it was observed that a boys' lavatory had been converted to a room used by a reading specialist in conducting her tutorials. Although the toilets,

9. Additionally, at the request of Intervenor Community Advisory Board for Bilingual Education, the court visited the Herman Badillio Community School and School 36, which also has a large Hispanic student population. The Community Advisory Board has taken the position that sufficient progress is underway within the bilingual program schools to assure integration in these schools.

10. BEDS' statistics, October, 1982.

11. School 59 was designated a magnet school as part of the Phase III desegregation plan. *See Arthur v. Nyquist* order of June 19, 1980.

sinks, and urinals had been removed, the original character of the room had not substantially changed. It was explained that the physical limitations of the building precluded any other solution to providing adequate space for remedial reading activities. Students complain that the 81-year-old structure occasionally lacks heat and hot water and that the lavatories are inadequate. Parents and teachers point to the unkept promise to construct a new building made some seven years ago.

Despite these shortcomings in meeting the court's established guidelines for desegregating these three individual schools, the court believes that the Board has met its burden in demonstrating that further desegregation of these schools is not practicable at this time. For the present, the further use of desegregation tools outlined in *Swann v. Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 does not appear to be an effective and feasible remedy for the racial imbalance which exists. And, while fully recognizing the realities which exist today, the court also recognizes the Board's corresponding commitment to continue the process of desegregating the Buffalo Public Schools. *See Clark v. Board of Education of the Little Rock School District,* at 272. The construction of a unitary school system does not require racial balance in all schools, *Swann v. Board of Education,* 402 U.S. at 24, 91 S.Ct. at 1280; "[w]hat is required is that every reasonable effort be made to eradicate segregation and its insidious residue." *Ross v. Houston Independent School District,* 699 F.2d at 228.

In support of their respective positions, both plaintiffs and the Board rely on their prior submissions and the testimony of Assistant Superintendent of Schools Joseph T. Murray, given at the time of the school funding hearings held last July. *See Arthur v. Nyquist,* 547 F.Supp. at 483. He explained that the desegregation techniques used by the Board and approved by the Supreme Court—pairing, clustering, redrawing attendance zones, closing schools, and fixed assignments—would not be effec-

tive in reducing the racial imbalance in these schools.

The reasons for this conclusion are based upon the highly complex and crafted plan which has been developed during the various desegregation phases to achieve racial balance in the school system as a whole. Various factors, including building capacities, age of students, attendance zones, fixed assignments, magnet schools, regional magnet schools, Early Childhood Centers, Academies, handicapped students, neighborhood desegregated schools, clusters, Q.I.E., and feeder patterns must all be taken into account in the Board's overall strategy of desegregation in the elementary and high schools of the system.

This strategy and approach have proven to be highly effective and have received national attention. Not only are all the former racially identified majority schools in compliance with the court's guidelines, but of the 56 elementary schools within the entire system, only these three which remain outside the court's guidelines are objectionable to the plaintiffs.

These desegregation factors have an interdependent relationship which extends and influences every school within the system. As a consequence, the entire plan requires careful balance to achieve racial desegregation. In response to the plaintiffs' proposed cluster plan offered last summer, the Board argued that any attempt to increase the number of majority students attending these three schools would place in jeopardy the acceptable racial balance already attained at the schools to be included in plaintiffs' proposed clusters, and threaten the entire magnet school program. The sensitivity of this balance was acknowledged by the court in its rejection of plaintiffs' proposal as ill-conceived. *See Arthur v. Nyquist,* 547 F.Supp. at 484.

The Board further maintains that in applying all these factors, there are simply not enough majority students presently attending the Buffalo Public Schools to increase the majority population at these three schools. The court notes that the pupil population of the public schools in October,

1973, was 61,060, of whom 53.3 percent were white, and 46.7 percent were non-white. *Arthur v. Nyquist,* 415 F.Supp. at 916. In October, 1982, 46,757 students attended the Buffalo Public School System, of whom 45.7 percent were white and 54.3 percent were non-white.[12] Thus, while the population of Buffalo as a whole has drastically declined over the last ten years, the role of majority students in the elementary school desegregation process has become more critical.[13]

As part of his testimony, Mr. Murray explained that with a decreasing majority enrollment in the Buffalo Public Schools, planning by the Board and the School Administration in meeting the guidelines established by the court is a crucial element. A small error in projections of some 14 majority pupils attending a particular school could determine whether the school remained desegregated under the court's guidelines. Additionally, because the Board has developed complicated feeder patterns to channel students into desegregated high schools, any change in the elementary school desegregation plan must also be reflected in the high school desegregation program.

All these factors comprise the "practicalities of the situation"—a situation which leads the court to conclude that the Board has acted in good faith in carrying out the elementary school desegregation program and has exhausted all the tools of desegregation which are presently available. For the same reasons, the racial imbalance at these three schools cannot be considered the result of the Board's past or present segregative actions. *Keyes v. School District No. 1,* 413 U.S. 189, 211 and n. 17, 93 S.Ct. 2686, 2698 and n. 17, 37 L.Ed.2d 548 (1973),

*Swann v. Board of Education,* 402 U.S. at 31–32, 91 S.Ct. at 1284–1285.

The Board's plan to desegregate Schools 53 and 74 is to continue to recruit majority children and to place an Academy at each of these schools to accommodate the pupils who are graduated from the Early Childhood Center programs. Students living within these school attendance zones remain eligible to attend magnet schools and participate in the Q.I.E. program. The Board's plan to desegregate School 59 is dependent upon the construction of a new school building for Grades pre-Kindergarten through 4.

Given the history of parents' cooperation and the willingness of the Board to resolve problems and its commitment to desegregation, the court is confident that these plans will succeed. The court is satisfied that given the practicalities involved here, the Board's proposals are the only realistic and practicable solution to the desegregation process presently available.[14]

Since the rejection of their proposed cluster plan last summer, plaintiffs have not come forward with any alternative desegregation plan and now characterize their proposal as only a "suggestion." This court has consistently stated in this case that it is an arbiter of a legal dispute, and "[i]n the adversary system mandated by the Constitution, Art. III, § 1, it is the duty of the parties to assert their position, to adduce evidence, and, in institutional litigation, to suggest remedial measures." *Ross v. Houston Independent School District,* 699 F.2d at 227. Because the court lacks any suggestions of alternative remedial measures, the imposition of any new measures under these circumstances can only be viewed as counterproductive. From the evidence presented by the parties, any such measures

---

**12.** BEDS' statistics, October, 1982.

**13.** As previously noted, the majority student population decline in the public school system cannot be attributed to white flight. *Arthur v. Nyquist,* 547 F.Supp. at 470 and n. 3. Rather, the decline in the absolute number of students attending the Buffalo Public Schools and the increasing percentage of minority students attending the public schools as a longstanding trend was first noted in the court's liability

finding, *Arthur v. Nyquist,* 415 F.Supp. at 915, n. 14, and n. 15.

**14.** The court notes that as the enrollment in the public schools continues to decline, it may be necessary to close some additional schools. If and when this occurs, there may also be an opportunity to increase the number of majority students attending these three schools.

would adversely affect schools which are already desegregated and in compliance with the racial balance guidelines. All the parties would agree that the alternative of resegregation is not an alternative. Thus, in reviewing the conditions in this district, the accomplishments to date, and feasibility of further desegregation measures, plaintiffs' motion must be denied.

Although the Board has successfully overcome the presumption of discriminatory student assignments concerning these three schools, more is required before the court may conclude that a school system has eradicated the last vestiges of segregation and achieved unitary status. Faculty, staff, transportation, extracurricular activities, and facilities are also among the most important indicia of a racially identified school *Swann v. Board of Education,* 402 U.S. at 18, 91 S.Ct. at 1277. In this respect, the continued use of School 59/24 presents additional serious questions.

For the last several years the Board has placed as its first priority the construction of a new School 59. During this time, the Board has requested the Mayor and the Common Council to approve construction of a new School 59 for Grades pre-Kindergarten through 4 in the capital expenditure portion of the City budget without success. In the interim, the Board has opted to build the various campuses of School 59 in phases. The first phase, the construction of a building for Grades 7 and 8, is presently underway at the Zoological Gardens.[15] The second phase is the construction of a new primary school building near the site of the original School 59 on Glenwood Avenue. The third phase is the modernization of the school facilities used at the Buffalo Museum of Science.

Clearly, a new School 59 for Grades pre-Kindergarten through 4 is needed. The Board maintains that the present School 59/24 is unsuitable for an Academy and an Early Childhood Center and that desegregation efforts will not be successful until a new school is completed.

**15.** The funding for the construction of the Zoological Gardens Campus is derived from City

The court has no desire to become embroiled in another funding controversy between the City and the School Board. *See Arthur v. Nyquist,* 547 F.Supp. at 484 and n. 17. We are all too familiar with the budgetary process and the resources which are available to the school system. Nevertheless, it is difficult to understand why the City defendants have consistently overlooked the construction of a new School 59 as the Board's foremost priority, while approving capital construction at other schools, such as Burgard. It is apparent that any efforts at desegregating the lower grades of School 59 are dependent upon the construction of a new building. The limited responses which the court has heard concerning the reasons why School 59/24 remains temporarily in operation after seven years do not stand the test of close scrutiny required under the Constitution.

Accordingly, the court directs the parties to meet with the court on June 21, 1983, at 1 p.m. and orders City defendants to show cause at that time why funding for the construction of a new School 59 cannot be undertaken as soon as possible.

So ordered.

capital construction and Zoological funds.